Clinton SEWELL, M.D., Caricare Medical Services, P.C., Plaintiffs–Counter–Defendants–Appellants,

v.

The 1199 NATIONAL BENEFIT FUND FOR HEALTH AND HUMAN SERVICES, Defendant–Counterclaimant–Appellee.

No. 05–6096–cv.

United States Court of Appeals, Second Circuit.

June 14, 2006.

Vivia L. Joseph, Cambria Heights, N.Y. (Deveraux Cannick, Aiello & Cannick, Maspeth, N.Y., of counsel), for Appellants.

Jennifer Middleton, Levy Ratner, P.C., New York, N.Y. (Jeffrey G. Stein, General Counsel 1199 SEIU Funds, New York, N.Y., on the brief), for Appellee.

PRESENT: Hon. CHESTER J. STRAUB, Hon. SONIA SOTOMAYOR, Hon. PETER W. HALL, Circuit Judges.

### SUMMARY ORDER

Plaintiffs–Counter–Defendants–Appellants Clinton Sewell, M.D. and Caricare Medical Services, P.C. ("Sewell") appeal from a decision of the United States District Court for the Southern District of New York (Jed S. Rakoff, *Judge)* awarding judgment after a bench trial to the Defendant–Counterclaimant–Appellee the 1199 National Benefit Fund for Health and Human Services ("the Fund"). Sewell brought this action under § 502 of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132, seeking payment for medical services he provided that were withheld by the Fund. After a bench trial, the District Court found that the Fund had acted reasonably in withholding these payments to recoup prior overpayments to Sewell because of his improper billing practices. On appeal, Sewell contends that the Fund acted arbitrarily and capriciously in its investigation of his billing practices. Further, the Fund, according to Sewell, acted arbitrarily and capriciously in the manner it chose to recover the alleged overpayments. As neither of these arguments has merit, we affirm the District Court's judgment.

## I.

Although we assume familiarity with the facts and procedural history of this case, we will briefly review the events giving rise to this case. Sewell is a physician practicing medicine in New York through his company Caricare Medical Services P.C. The Fund is a multi-employer trust fund established for benefits of members of a labor union. The Fund qualifies as an ERISA "employee welfare benefit plan." *See* 29 U.S.C. § 1002(1). The terms of the benefit plan are described in its Summary Plan Description (SPD). During the period relevant to this appeal, Sewell provided medical care to members of the union who participated in the Fund.

In 2003, the Fund formed a committee to investigate possible fraud and abuse of its billing system by its medical providers (the "Committee"). The Committee was composed of doctors employed by the Fund and other employees with different areas of expertise, including health care analysis, claims processing, and management of the Fund. One of the Committee members, Ralph Ullman, performed a study of the billing practices of the medical providers to identify "upcoding." Upcoding is a practice whereby medical providers submit claims to the Fund for more expensive procedures or treatments than those the patients actually received. The Fund requires its medical providers to submit bills for payment using the American Medical Association's (AMA) procedure codes (the "codes"). Each code corresponds to a particular treatment and a dollar amount that the Fund has agreed to pay. The AMA provides descriptions of the treatments, and the medical provider is responsible for selecting the appropriate code. Upcoding occurs when the medical provider selects a higher or more expensive code than the one that accurately reflects the services provided.

Ullman's study analyzed office visit claims submitted by 800 medical providers for the Fund. The study compared each of the 800 providers' code usage to average benchmarks for each provider's type of practice. The study identified 70 doctors—including Sewell—whose code usage varied significantly from the norms. For example, Sewell billed 99.7% of his new patients at the highest billing code for an office visit as compared to comparable doctors who billed 30.2% at the highest code. Sewell also billed 88.7% of office visits by his established patients at the highest code while other comparable doctors only coded 8.7% of their established patients' visits at this code.

Based on these findings, the Fund began a dialogue with Sewell regarding his coding practices. On December 5, 2003, Sewell wrote to the Fund and provided a description of his method or "protocol" for billing and coding. In this letter, Sewell described how he assigned each office visit a number of "units" based on the time spent with the patient and the complexity of the issues. Sewell valued each "unit" as five dollars. Sewell then selected the code that best approximated the cash value he had assigned the procedure. Instead of matching the treatment provided to the appropriate code, Sewell selected the code that matched the dollar value he wished to receive. As he explained in another letter to the Fund, "[t]he billing protocol that I use ... allows me to accurately and with great consistency obtain a fair value for each patient encountered. The value is the dollar amount that is sought as compensation.... [The] code that provides a payment amount that is closest to this amount is the code that is submitted for reimbursement."

After conducting further investigation, the Fund determined that from 1999 to 2003 Sewell had overbilled the Fund ap-

proximately $200,000 due to upcoding. The Fund recouped this amount by withholding payment on new claims submitted by Sewell from approximately January 2004 through the middle of 2005. To determine the amount to be set off against Sewell's debt, the Fund "downcoded" the claims submitted by Sewell—i.e. substituted a lower, less expensive code for the procedure than the one selected by Sewell.

## II.

ERISA section 502 provides that a "civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B). Although section 1132(a)(1)(B) grants only plan beneficiaries or participants standing to bring a civil action to recover plan benefits, we have recognized a narrow exception that grants healthcare providers standing provided that a beneficiary has assigned to the provider his claim in exchange for healthcare services. *Simon v. Gen. Elec. Co.*, 263 F.3d 176, 177–78 (2d Cir.2001) (per curiam)

(citing *I.V. Servs. of Am., Inc. v. Trustees of Am. Consulting Eng'rs Council Ins. Trust Fund*, 136 F.3d 114, 117 n. 2 (2d Cir.1998)). Here, Sewell alleged in his complaint that he was an assignee of benefits under the Plan and that he therefore had a claim under ERISA against the Fund. Although the Fund apparently argued below that Sewell is not an assignee of any actual benefits from any plan beneficiary and that he therefore lacks standing to sue under ERISA, the Fund did not advance this argument on appeal and has consequently waived it.[1] We, therefore, turn to consider the merits.

The parties agree that we must review the Fund's denial of benefits under an arbitrary and capricious standard because the benefit plan gives the administrator discretionary authority both to determine eligibility for benefits and to construe the terms of the plan. *See Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995). Following a bench trial, we review a district court's findings of fact for clear error and its conclusions of law de novo.

---

**1.** At the time relevant to this appeal, Sewell was a participating provider under the Plan. His relationship with the Fund was governed by a Physician Participation Agreement with the Fund and included a fee schedule for covered services. According to the SPD, participating providers like Sewell "accept the Fund's payment as payment in full" for covered services, and the Plan's participants or beneficiaries receive care for those services "at no cost." When a participant or beneficiary uses a non-participating provider, by contrast, he or she "can be billed whatever the doctor normally charges" and the participant will "have to pay any cost over the Fund's allowance" for the service provided.

In the latter circumstance, the patient either pays the bill and is reimbursed by the Fund or assigns his or her right to benefits to the provider, who seeks payment directly from the Fund. Where the patient receives services from a participating provider, however, it is not clear that the patient has anything to assign because the patient is entitled only

to healthcare at no cost, not reimbursement. If the participant or beneficiary has no right to payment to assign to the participating provider, it is doubtful that the "narrow exception" to ERISA's otherwise stringent standing requirement would apply. *Cf. Blue Cross of Cal. v. Anesthesia Care Assocs. Med. Group, Inc.*, 187 F.3d 1045, 1050 (9th Cir.1999) ("We hold that the Providers' claims, which arise from the terms of their provider agreements and could not be asserted by their patient-assignors, are not claims for benefits under the terms of ERISA plans, and hence do not fall within § 502(a)(1)(B)."); *Pascack Valley Hosp., Inc. v. Local 464A UFCW Welfare Reimbursement Plan*, 388 F.3d 393, 400–02 (3d Cir.2004) (noting that the hospital, which had contracted with a consultant that in turn had contracted with individual ERISA plans, did not have standing to sue under ERISA because no claims had been assigned to it and the hospital's claims were "predicated on a legal duty that is independent of ERISA").

*See* Fed.R.Civ.P. 52(a); *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 135 (2d Cir.2001). Because the District Court's determination that the Fund's decisions were not arbitrary and capricious is a legal conclusion, we review that determination de novo. *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 145 (2d Cir.2003).

The first issue on appeal is whether the Fund acted arbitrarily or capriciously in determining that Sewell had engaged in upcoding. Sewell argues that the District Court erred by ignoring the Fund's breaches of the Physician Participation Agreement between Sewell and the Fund (the "Agreement"). Sewell, however, is judicially estopped from claiming that the Fund breached the Agreement.

Judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (internal quotation marks omitted). Judicial estoppel is invoked where (1) a party's later position is "clearly inconsistent" with its earlier position, and (2) the party has succeeded in persuading a court to accept its earlier position. *Id.* at 750, 121 S.Ct. 1808; *see also Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir.1999).

In his Memorandum in Support of Its Motion for Reconsideration of the District Court's June 22, 2005 order, Sewell disclaimed that the Agreement forms the basis of his complaint and urged the court to reconsider its ruling that the action involved a breach of the Agreement:

> [T]he contractual relationship between the parties is not the basis of Plaintiffs' lawsuit. Rather, the Complaint filed in this action shows that Plaintiffs are suing as assignees under [ERISA] seeking reimbursement of benefits assigned to Plaintiffs by Members who participate under Defendant's health care plan. Plantiffs reference to the Agreement is made solely in an effort to highlight for the Court that clause in the written agreement whereby Defendant agreed to compensate Plaintiffs "for Covered Services rendered to Members, which have been authorized as necessary pursuant to the UR program, in accordance with the applicable Benefit Fund fee schedule." Further, Plaintiffs have made no allegation that Defendant has refused to compensate Plaintiffs according to the applicable Benefit Fund fee schedule. Thus, no breach of contract has been alleged by Plaintiffs as against Defendant.

(Pls.'s Mem. in Supp. Recons. at 4.) This position is clearly inconsistent with his current claims that the SPD "did not establish the relationship between the parties; the Agreement did" (Appellant Br. at 30) and that the Fund breached the Agreement in its investigation of his billing practices (Appellant Br. at 15–29).

The second element of judicial estoppel is also present; the District Court was persuaded to accept Sewell's argument that his claim did not involve a breach of the Agreement. The District Court revised its order denying the Fund's motion for summary judgement and removed the sentence stating that the basis of the complaint was the Fund's breach of the Agreement. *Sewell v. 1199 Nat'l Ben. Fund for Health & Human Servs.*, No. 04 Civ. 4474, 2005 WL 1863816, at * 1 (S.D.N.Y. Aug. 4, 2005). Sewell may not now claim that the Fund breached its obligations under the Agreement.

■ Returning to the merits of the case, we conclude that Sewell has failed to show that the Fund acted unreasonably in deter-

mining that he over-billed for the services he provided. Under the terms of the Plan, the Fund had authority not only "[t]o decide all matters arising in connection with entitlement to benefits, the ... amount ... of benefits and the operation of the Plan," but also "[t]o make all factual determinations required to administer, apply, construe and interpret the Plan." We agree with the District Court that the Fund's conclusion that Dr. Sewell engaged in a practice of improper upcoding is neither arbitrary nor capricious. *See Celardo,* 318 F.3d at 147 (deferring to ERISA plan's finding that the participant had acted illegally and was disqualified from receiving benefits).

■ Sewell's second argument is that the Fund acted arbitrarily and capriciously in its withholding of payments to him. Sewell also challenges the Fund's calculation of the amount credited against the overpayment, specifically the Fund's practice of downcoding. The District Court correctly held that the Fund did not act arbitrarily or capriciously either by withholding future payments to Sewell or in its calculation of the amount to be set off against the overpayment. The SPD permits the Fund to withhold benefits where beneficiaries "[d]o not repay the Fund for benefits that [they] were not entitled to receive."[2] Indeed, the Fund has a fiduciary duty to "ensure that [the] plan receives all funds to which it is entitled." *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.,* 472 U.S. 559, 571, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985). The Fund, like any trustee, cannot pay a beneficiary more than the trust instrument authorizes and is entitled to recover any

excess payment. *See Hoffa v. Fitzsimmons,* 673 F.2d 1345, 1354 (D.C.Cir.1982); *see also* Restatement (Second) of Trusts § 254 (1959).

On the basis of his incorrect billing, the Fund overpaid Sewell for his services. Upon learning of the overpayments to Sewell, the Fund had both the duty and the authority to recoup the overpayments. Moreover, the Fund's methodology for withholding—downcoding his incoming bills one level—was a fair approximation of the correct value of his services and a reasonable response to the inherent difficulties posed by a more individualized inquiry.

For the foregoing reasons, the judgment of the District Court is hereby **AFFIRMED.**

---

**2.** There is one additional issue presented by this case: the Fund withheld from Sewell payments due for services provided to patient Y in order to recoup overpayments to Sewell for services previously provided to patient X.

We see no bar to this kind of offset so long as actual beneficiaries are not thereby denied benefits for which they are otherwise eligible under the Plan.