# NEW HAMPSHIRE *v.* MAINE

No. 130, Orig.   Argued April 16, 2001—Decided May 29, 2001

*Paul D. Stern,* Deputy Attorney General of Maine, argued the cause for defendant. With him on the briefs were *An-*

745

*drew Ketterer,* Attorney General, and *Christopher C. Taub* and *William R. Stokes,* Assistant Attorneys General.

*Jeffrey P. Minear* argued the cause for the United States as *amicus curiae.* With him on the brief were former *Solicitor General Waxman, Assistant Attorney General Schiffer, Deputy Solicitor General Kneedler,* and *Patricia Weiss.*

*Leslie J. Ludtke,* Associate Attorney General of New Hampshire, argued the cause for plaintiff. With her on the briefs were *Phillip T. McLaughlin,* Attorney General, and *John R. Harrington.*

JUSTICE GINSBURG delivered the opinion of the Court.

The Piscataqua River lies at the southeastern end of New Hampshire's boundary with Maine. The river begins at the headwaters of Salmon Falls and runs seaward into Portsmouth Harbor (also known as Piscataqua Harbor). On March 6, 2000, New Hampshire brought this original action against Maine, claiming that the Piscataqua River boundary runs along the Maine shore and that the entire river and all of Portsmouth Harbor belong to New Hampshire. Maine has filed a motion to dismiss on the ground that two prior proceedings—a 1740 boundary determination by King George II and a 1977 consent judgment entered by this Court—definitively fixed the Piscataqua River boundary at the middle of the river's main channel of navigation.

The 1740 decree located the Piscataqua River boundary at the "Middle of the River." Because New Hampshire, in the 1977 proceeding, agreed without reservation that the words "Middle of the River" mean the middle of the Piscataqua River's main channel of navigation, we conclude that New Hampshire is estopped from asserting now that the boundary runs along the Maine shore. Accordingly, we grant Maine's motion to dismiss the complaint.

I

New Hampshire and Maine share a border that runs from northwest to southeast. At the southeastern end of the

border, the easternmost point of New Hampshire meets the southernmost point of Maine. The boundary in this region follows the Piscataqua River eastward into Portsmouth Harbor and, from there, extends in a southeasterly direction into the sea. Twenty-five years ago, in a dispute between the two States over lobster fishing rights, this Court entered a consent judgment fixing the precise location of the "lateral marine boundary," *i. e.*, the boundary in the marine waters off the coast of New Hampshire and Maine, from the closing line of Portsmouth Harbor five miles seaward to Gosport Harbor in the Isles of Shoals. *New Hampshire* v. *Maine*, 426 U. S. 363 (1976); *New Hampshire* v. *Maine*, 434 U. S. 1, 2 (1977). This case concerns the location of the Maine-New Hampshire boundary along the inland stretch of the Piscataqua River, from the mouth of Portsmouth Harbor westward to the river's headwaters at Salmon Falls. (A map of the region appears as an appendix to this opinion.)

In the 1970's contest over the lateral marine boundary, we summarized the history of the interstate boundary in the Piscataqua River region. See *New Hampshire* v. *Maine*, 426 U. S., at 366–367. The boundary, we said, "was in fact fixed in 1740 by decree of King George II of England" as follows:

> " 'That the Dividing Line shall pass up thro the Mouth of Piscataqua Harbour and up the Middle of the River . . . . And that the Dividing Line shall part the Isles of Shoals and run thro the Middle of the Harbour between the Islands to the Sea on the Southerly Side. . . .' " *Id.*, at 366 (quoting the 1740 decree).

In 1976, New Hampshire and Maine "expressly agree[d] . . . that the decree of 1740 fixed the boundary in the Piscataqua Harbor area." *Id.*, at 367 (internal quotation marks omitted). "Their quarrel was over the location . . . of the 'Mouth of Piscataqua River,' 'Middle of the River,' and 'Middle of the Harbour' within the contemplation of the decree."

*Ibid.* The meaning of those terms was essential to delineating the lateral marine boundary. See Report of Special Master, O. T. 1975, No. 64 Orig., pp. 32–49 (hereinafter Report). In particular, the northern end of the lateral marine boundary required a determination of the point where the line marking the "Middle of the [Piscataqua] River" crosses the closing line of Piscataqua Harbor. *Id.*, at 43.

In the course of litigation, New Hampshire and Maine proposed a consent decree in which they agreed, *inter alia,* that the words "Middle of the River" in the 1740 decree refer to the middle of the Piscataqua River's main channel of navigation. Motion for Entry of Judgment By Consent of Plaintiff and Defendant in *New Hampshire* v. *Maine,* O. T. 1973, No. 64 Orig., p. 2 (hereinafter Motion for Consent Judgment). The Special Master, upon reviewing pertinent history, rejected the States' interpretation and concluded that "the geographic middle of the river and not its main or navigable channel was intended by the 1740 decree." Report 41. This Court determined, however, that the States' interpretation "reasonably invest[ed] imprecise terms" with a definition not "wholly contrary to relevant evidence." *New Hampshire* v. *Maine,* 426 U. S., at 369. On that basis, the Court declined to adopt the Special Master's construction of "Middle of the River" and directed entry of the consent decree. *Id.,* at 369–370. The final decree, entered in 1977, defined "Middle of the River" as "the middle of the main channel of navigation of the Piscataqua River." *New Hampshire* v. *Maine,* 434 U. S., at 2.

The 1977 consent judgment fixed only the lateral marine boundary and not the inland Piscataqua River boundary. See Report 42–43 ("For the purposes of the present dispute, . . . it is unnecessary to lay out fully the course of the boundary as it proceeds upriver . . . ."). In the instant action, New Hampshire contends that the inland river boundary "run[s] along the low water mark on the Maine shore," Complaint 49, and asserts sovereignty over the entire river

and all of Portsmouth Harbor, including the Portsmouth Naval Shipyard on Seavey Island located within the harbor just south of Kittery, Maine, *id.*, at 34.* Relying on various historical records, New Hampshire urges that "Middle of the River," as those words were used in 1740, denotes the main branch of the river, not a midchannel boundary, Brief in Opposition to Motion to Dismiss 12–16, and that New Hampshire, not Maine, exercised sole jurisdiction over shipping and military activities in Portsmouth Harbor during the decades before and after the 1740 decree, *id.*, at 17–19, and nn. 35–38.

While disagreeing with New Hampshire's understanding of history, see Motion to Dismiss 9–14, 18–19 (compiling evidence that Maine continually exercised jurisdiction over the harbor and shipyard from the 1700's to the present day), Maine primarily contends that the 1740 decree and the 1977 consent judgment divided the Piscataqua River at the middle of the main channel of navigation—a division that places Seavey Island within Maine's jurisdiction. Those earlier proceedings, according to Maine, bar New Hampshire's complaint under principles of claim and issue preclusion as well as judicial estoppel.

We pretermit the States' competing historical claims along with their arguments on the application *vel non* of the res judicata doctrines commonly called claim and issue preclusion. Claim preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit. Issue preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of an issue of fact or law actually

---

*According to New Hampshire, the Federal Government in recent years has taken steps to close portions of the shipyard and to lease its land and facilities to private developers. Complaint 34. New Hampshire and Maine assert competing claims of sovereignty over private development on shipyard lands. *Ibid.*

litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or a different claim. See Restatement (Second) of Judgments §§ 17, 27, pp. 148, 250 (1980); D. Shapiro, Civil Procedure: Preclusion in Civil Actions 32, 46 (2001). In the unusual circumstances this case presents, we conclude that a discrete doctrine, judicial estoppel, best fits the controversy. Under that doctrine, we hold, New Hampshire is equitably barred from asserting—contrary to its position in the 1970's litigation—that the inland Piscataqua River boundary runs along the Maine shore.

## II

"[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *Davis* v. *Wakelee*, 156 U. S. 680, 689 (1895). This rule, known as judicial estoppel, "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Pegram* v. *Herdrich*, 530 U. S. 211, 227, n. 8 (2000); see 18 Moore's Federal Practice § 134.30, p. 134–62 (3d ed. 2000) ("The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding"); 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4477, p. 782 (1981) (hereinafter Wright) ("absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory").

Although we have not had occasion to discuss the doctrine elaborately, other courts have uniformly recognized that its purpose is "to protect the integrity of the judicial process," *Edwards* v. *Aetna Life Ins. Co.*, 690 F. 2d 595, 598 (CA6

1982), by "prohibiting parties from deliberately changing positions according to the exigencies of the moment," *United States* v. *McCaskey,* 9 F. 3d 368, 378 (CA5 1993). See *In re Cassidy,* 892 F. 2d 637, 641 (CA7 1990) ("Judicial estoppel is a doctrine intended to prevent the perversion of the judicial process."); *Allen* v. *Zurich Ins. Co.,* 667 F. 2d 1162, 1166 (CA4 1982) (judicial estoppel "protect[s] the essential integrity of the judicial process"); *Scarano* v. *Central R. Co.,* 203 F. 2d 510, 513 (CA3 1953) (judicial estoppel prevents parties from "playing 'fast and loose with the courts'" (quoting *Stretch* v. *Watson,* 6 N. J. Super. 456, 469, 69 A. 2d 596, 603 (1949))). Because the rule is intended to prevent "improper use of judicial machinery," *Konstantinidis* v. *Chen,* 626 F. 2d 933, 938 (CADC 1980), judicial estoppel "is an equitable doctrine invoked by a court at its discretion," *Russell* v. *Rolfs,* 893 F. 2d 1033, 1037 (CA9 1990) (internal quotation marks and citation omitted).

Courts have observed that "[t]he circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle," *Allen,* 667 F. 2d, at 1166; accord, *Lowery* v. *Stovall,* 92 F. 3d 219, 223 (CA4 1996); *Patriot Cinemas, Inc.* v. *General Cinema Corp.,* 834 F. 2d 208, 212 (CA1 1987). Nevertheless, several factors typically inform the decision whether to apply the doctrine in a particular case: First, a party's later position must be "clearly inconsistent" with its earlier position. *United States* v. *Hook,* 195 F. 3d 299, 306 (CA7 1999); *In re Coastal Plains, Inc.,* 179 F. 3d 197, 206 (CA5 1999); *Hossaini* v. *Western Mo. Medical Center,* 140 F. 3d 1140, 1143 (CA8 1998); *Maharaj* v. *Bankamerica Corp.,* 128 F. 3d 94, 98 (CA2 1997). Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or the second court was misled," *Edwards,* 690 F. 2d, at 599. Absent suc-

cess in a prior proceeding, a party's later inconsistent position introduces no "risk of inconsistent court determinations," *United States* v. *C. I. T. Constr. Inc.*, 944 F. 2d 253, 259 (CA5 1991), and thus poses little threat to judicial integrity. See *Hook*, 195 F. 3d, at 306; *Maharaj*, 128 F. 3d, at 98; *Konstantinidis*, 626 F. 2d, at 939. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. See *Davis*, 156 U. S., at 689; *Philadelphia, W., & B. R. Co.* v. *Howard*, 13 How. 307, 335–337 (1852); *Scarano*, 203 F. 2d, at 513 (judicial estoppel forbids use of "intentional self-contradiction . . . as a means of obtaining unfair advantage"); see also 18 Wright § 4477, p. 782.

In enumerating these factors, we do not establish inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel. Additional considerations may inform the doctrine's application in specific factual contexts. In this case, we simply observe that the factors above firmly tip the balance of equities in favor of barring New Hampshire's present complaint.

New Hampshire's claim that the Piscataqua River boundary runs along the Maine shore is clearly inconsistent with its interpretation of the words "Middle of the River" during the 1970's litigation. As mentioned above, *supra*, at 747, interpretation of those words was "necessary" to fixing the northern endpoint of the lateral marine boundary, Report 43. New Hampshire offered two interpretations in the earlier proceeding—first agreeing with Maine in the proposed consent decree that "Middle of the River" means the middle of the main channel of navigation, and later agreeing with the Special Master that the words mean the geographic middle of the river. Both constructions located the "Middle of the River" somewhere other than the Maine shore of the Piscataqua River.

Moreover, the record of the 1970's dispute makes clear that this Court accepted New Hampshire's agreement with Maine that "Middle of the River" means middle of the main navigable channel, and that New Hampshire benefited from that interpretation. New Hampshire, it is true, preferred the interpretation of "Middle of the River" in the Special Master's report. See Exceptions and Brief for Plaintiff in *New Hampshire* v. *Maine*, O. T. 1975, No. 64 Orig., p. 3 (hereinafter Plaintiff's Exceptions) ("the boundary now proposed by the Special Master is more favorable to [New Hampshire] than that recommended in the proposed consent decree"). But the consent decree was sufficiently favorable to New Hampshire to garner its approval. Although New Hampshire now suggests that it "compromised in Maine's favor" on the definition of "Middle of the River" in the 1970's litigation, Brief in Opposition to Motion to Dismiss 24, that "compromise" enabled New Hampshire to settle the case, see *id.*, at 24–25, on terms beneficial to both States. Notably, in their joint motion for entry of the consent decree, New Hampshire and Maine represented to this Court that the proposed judgment was "in the best interest of each State." Motion for Consent Judgment 1. Relying on that representation, the Court accepted the boundary proposed by the two States. *New Hampshire* v. *Maine*, 434 U. S. 1 (1977).

At oral argument, New Hampshire urged that the consent decree simply fixed the "Middle of the River" at "an arbitrary location based on the administrative convenience of the parties." Tr. of Oral Arg. 37. To the extent New Hampshire implies that the parties settled the lateral marine boundary dispute without judicial endorsement of their interpretation of "Middle of the River," that view is foreclosed by the Court's determination that "[t]he consent decree . . . proposes a wholly permissible final resolution of the controversy both as to facts and law," *New Hampshire* v. *Maine*, 426 U. S., at 368–369. Three dissenting Justices agreed with New Hampshire that the consent decree in-

terpreted the middle-of-the-river language "by agreements of convenience" and not "in accordance with legal principles." *Id.*, at 371 (White, J., joined by Blackmun and STEVENS, JJ., dissenting). But the Court concluded otherwise, noting that its acceptance of the consent decree involved "[n]othing remotely resembling 'arbitral' rather than 'judicial' functions," *id.*, at 369. The consent decree "reasonably invest[ed] imprecise terms with definitions that give effect to [the 1740] decree," *ibid.*, and "[did] not fall into the category of agreements that we reject because acceptance would not be consistent with our Art. III function and duty," *ibid.*

New Hampshire also contends that the 1977 consent decree was entered without "a searching historical inquiry into what that language ['Middle of the River'] meant." Tr. of Oral Arg. 39. According to New Hampshire, had it known then what it knows now about the relevant history, it would not have entered into the decree. *Ibid.* We do not question that it may be appropriate to resist application of judicial estoppel "when a party's prior position was based on inadvertence or mistake." *John S. Clark Co.* v. *Faggert & Frieden, P. C.*, 65 F. 3d 26, 29 (CA4 1995); see *In re Corey*, 892 F. 2d 829, 836 (CA9 1989); *Konstantinidis*, 626 F. 2d, at 939. We are unpersuaded, however, that New Hampshire's position in 1977 fairly may be regarded as a product of inadvertence or mistake.

The pleadings in the lateral marine boundary case show that New Hampshire did engage in "a searching historical inquiry" into the meaning of "Middle of the River." See Reply Brief for Plaintiff in *New Hampshire* v. *Maine*, O. T. 1975, No. 64 Orig., pp. 3–9 (examining history of river boundaries under international law, proceedings leading up to the 1740 order of the King in Council, and relevant precedents of this Court). None of the historical evidence cited by New Hampshire remotely suggested that the Piscataqua River boundary runs along the Maine shore. In fact, in attempting to place the boundary at the geographic middle of the

river, New Hampshire acknowledged that its agents in 1740 understood the King's order to "adjudg[e] *half of the river to*" the portion of Massachusetts that is now Maine. *Id.,* at 6 (emphasis in original) (quoting N. H. State Papers, XIX, pp. 591, 596–597); see Reply Brief in No. 64 Orig., *supra,* at 4 (*"The intention of those participating in the proceedings leading to the [1740 decree] was to use 'geographic middle' as the Piscataqua boundary."* (emphasis in original)). In addition, this Court independently determined that "there is nothing to suggest that the location of the 1740 boundary agreed upon by the States is wholly contrary to relevant evidence." *New Hampshire* v. *Maine,* 426 U. S., at 369.

Nor can it be said that New Hampshire lacked the opportunity or incentive to locate the river boundary at Maine's shore. In its present complaint, New Hampshire relies on historical materials—primarily official documents and events from the colonial and postcolonial periods, see Brief in Opposition to Motion to Dismiss 12–19—that were no less available 25 years ago than they are today. And New Hampshire had every reason to consult those materials: A river boundary running along Maine's shore would have placed the northern terminus of the lateral marine boundary much closer to Maine, "result[ing] in hundreds if not thousands of additional acres of territory being in New Hampshire rather than Maine," Tr. of Oral Arg. 48 (rebuttal argument of Maine). Tellingly, New Hampshire at the time understood the importance of placing the northern terminus as close to Maine as possible. While agreeing with the Special Master that "Middle of the River" means geographic middle, New Hampshire insisted that the geographic middle should be determined by using the banks of the river, not low tide elevations (as the Special Master had proposed), as the key reference points—a methodology that would have placed the northern terminus 350 yards closer to the Maine shore. Plaintiff's Exceptions 3.

In short, considerations of equity persuade us that application of judicial estoppel is appropriate in this case. Having convinced this Court to accept one interpretation of "Middle of the River," and having benefited from that interpretation, New Hampshire now urges an inconsistent interpretation to gain an additional advantage at Maine's expense. Were we to accept New Hampshire's latest view, the "risk of inconsistent court determinations," *C. I. T. Constr. Inc.*, 944 F. 2d, at 259, would become a reality. We cannot interpret "Middle of the River" in the 1740 decree to mean two different things along the same boundary line without undermining the integrity of the judicial process.

Finally, notwithstanding the balance of equities, New Hampshire points to this Court's recognition that "ordinarily the doctrine of estoppel or that part of it which precludes inconsistent positions in judicial proceedings is not applied to states," *Illinois ex rel. Gordon* v. *Campbell*, 329 U. S. 362, 369 (1946). Of course, "broad interests of public policy may make it important to allow a change of positions that might seem inappropriate as a matter of merely private interests." 18 Wright § 4477, p. 784. But this is not a case where estoppel would compromise a governmental interest in enforcing the law. Cf. *Heckler* v. *Community Health Services of Crawford Cty., Inc.*, 467 U. S. 51, 60 (1984) ("When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined. It is for this reason that it is well settled that the Government may not be estopped on the same terms as any other litigant."). Nor is this a case where the shift in the government's position is "the result of a change in public policy," *United States* v. *Owens*, 54 F. 3d 271, 275 (CA6 1995); cf. *Commissioner* v. *Sunnen*, 333 U. S. 591, 601 (1948) (collateral estoppel does not apply to Commissioner where pertinent statutory provisions or Treasury

regulations have changed between the first and second proceeding), or the result of a change in facts essential to the prior judgment, cf. *Montana* v. *United States*, 440 U. S. 147, 159 (1979) ("changes in facts essential to a judgment will render collateral estoppel inapplicable in a subsequent action raising the same issues"). Instead, it is a case between two States, in which each owes the other a full measure of respect.

What has changed between 1976 and today is New Hampshire's interpretation of the historical evidence concerning the King's 1740 decree. New Hampshire advances its new interpretation not to enforce its own laws within its borders, but to adjust the border itself. Given Maine's countervailing interest in the location of the boundary, we are unable to discern any "broad interes[t] of public policy," 18 Wright § 4477, p. 784, that gives New Hampshire the prerogative to construe "Middle of the River" differently today than it did 25 years ago.

\* \* \*

For the reasons stated, we conclude that judicial estoppel bars New Hampshire from asserting that the Piscataqua River boundary runs along the Maine shore. Accordingly, we grant Maine's motion to dismiss the complaint.

*It is so ordered.*

JUSTICE SOUTER took no part in the consideration or decision of this case.

[Appendix containing Portsmouth Harbor to Isles of Shoals map follows this page.]

# APPENDIX TO OPINION OF THE COURT

Adapted from Map 13283, Portsmouth Harbor to Isles of Shoals, National Oceanic and Atmospheric Administration, U. S. Department of Commerce (18th ed. Nov. 2000).