In re Ryan A. NASSBRIDGES, Debtor,

Louis A. Dimichele, William Murray, Arla Murray, Plaintiffs,

v.

Ryan A. Nassbridges, Defendant.

Bankruptcy No. 8:08–bk–12510–TA.

Adversary No. 8:08–ap–01326–TA.

United States Bankruptcy Court, C.D. California.

Aug. 17, 2010.

Steven L. Krongold, Irvine, CA, for Plaintiffs.

James C. Bastian, Jr., Melissa Davis, Foothill Ranch, CA, for Defendant.

## STATEMENT OF DECISION AFTER TRIAL

THEODOR C. ALBERT, Bankruptcy Judge.

This matter was tried before the court July 19–22, 2010, and taken under submission. All exhibits were received in evidence as were the testimony of the witnesses both by declaration and by live cross examination and re-direct. After considering the evidence the court renders this Statement of Decision.

This is an action brought by the Murrays to determine whether their claim against the debtor should be held non-dischargeable under the provisions of 11 U.S.C. §§ 523(a)(2)(A) [actual fraud],(a)(4) [fraud or defalcation while acting in a fiduciary capacity] and (a)(6) [willful and malicious injury to person or property]. A brief recitation of the facts should be helpful.

### 1. Facts

Most of the pertinent facts are without substantial controversy although certain specifics are disputed. The Murrays are cattle ranchers in Montana. Neither are particularly sophisticated investors although Mr. Murray before meeting the debtor had some ten years experience in investing, which ended unhappily as he lost considerable sums in broker discretionary account trading metals futures at another

brokerage. Ryan Nassbridges, the debtor, learned the precious metals investing business as a junior trader at Monex in Newport Beach for 3–4 years before founding American Bullion Exchange Corp. ("ABEX") in 2005. ABEX held itself out as an investment brokerage specializing exclusively in precious metals comprised of gold, silver, platinum and palladium bullion and coins, to be held for investment purposes. Significantly, nowhere in any of ABEX's glossy brochures [Exhibit "2"] is there any discussion of investment in futures contracts. Indeed, at the unnumbered page 7 of ABEX's brochure, between the many brightly colored pictures of gold coins and bullion ingots, appear the following statements:

> "One of the most important things to consider when investing in bullion is whether it is fully allocated, segregated and insured. Unless this is the case, there may be multiple claims against the bullion, or it may not even exist. Many precious metals investments are nothing more than promises to deliver bullion at some future date. Bullion investments must precisely track the price of bullion, and not be influenced by the equity markets. If the form of investment is dependent on a counter-party and the counter-party defaults, all of the benefits of holding precious metals could be lost at precisely the time when they are needed the most."

The clear implication of not only this statement, but the gist of the whole ABEX brochure's presentation, is that in troubled times there is no substitute for the comfort, security and gleam of actually possessing gold, "the 7000 year old currency." [Exhibit "2," at its unnumbered page 6].

The Murrays in the late summer of 2007 were looking for a new brokerage to replace Aleron and Coastline, brokerages which they left unhappily in August 2007 after losing considerably in a broker discretionary account involving precious metals futures trading. They still believed that gold could be a safe investment. The Murrays' telephone number was obtained by ABEX salesman, Curtis Lund, culled from a computer database. Mr. Lund placed a telephone call answered by Arla Murray in about August, 2007 inquiring about her interest in purchasing gold. She responded favorably and Mr. Lund caused ABEX brochures [Exhibits "1" and "2"] to be sent to her. She also visited ABEX's website and "was impressed." [A. Murray Declaration ¶¶ 3–5]. The Murrays both testified that a joint telephone conversation occurred in about September 2007 with the debtor in which he represented, among other things, that:

- He was president of ABEX and an experienced gold bullion dealer;
- He was a member of various precious metals trade groups;
- ABEX would use the Murrays' money to purchase gold bullion at spot prices [1];
- The Murrays' money would be separately accounted for and segregated from other customers;
- The Murrays' money would be kept in the United States;
- The Murrays' money would not be commingled with any other person or account;
- The Murrays' money would not be used to secure or extend credit of any customer or person;

---

1. "Spot price" means "The current price at which a particular commodity can be bought or sold at a specified time and place.... In other words, the price that is quoted if you want to buy any commodity today." Available at http://www.investopedia.com/terms/s/spotprice.asp.

- the Murrays could pay in full and take immediate physical delivery of the gold bullion or store our metal with HSBC Bank or an independent depository;
- the Murrays could finance their purchase through ABEX with a down payment, the balance would be subject to monthly finance charges; and
- ABEX was insured by Lloyd's of London. [Declarations of W. Murray and A. Murray ¶ 6].

Ms. Murray also testified to another telephone conversation with debtor in October 2007, after she received additional documentation from ABEX. Debtor "does not remember" making these representations [Nassbridges Declaration ¶ 5] although he does admit to speaking with the Murrays by telephone in September 2007. Debtor claims he does not remember any other conversations with the Murrays and claims that all communications were through Mr. Lund or in writing.[2] Instead, debtor relies primarily on the various writings exchanged between the parties which he claims expressly disclaim some of the Murrays' version of the conversation(s).

On October 23, 2007 Mr. Lund completed an ABEX Customer Information Form for the Murrays [Exhibit "30"] which he sent to them together with the ABEX brochures and disclosure agreement. [Exhibits "1" "2" and "3"]. The Murrays signed and returned each form as requested. The Murrays began a series of trades by wiring money to ABEX [*e.g.* Exhibit "4"] and or sending to ABEX coins for sale and use of the price to purchase gold. In each case the buy or sell was executed by debtor although recorded by Mr. Lund by reading a telephone script with the particulars of the transaction. [*see e.g.* Exhibit "28"] Mr. Lund testified that he was led

to believe that each trade involved a purchase of gold bullion by ABEX on the Murrays' behalf. [Lund Declaration ¶ 12]. Indeed, "gold bullion" is specifically mentioned in the script. [Exhibits "28" and "51"]. The Murrays likewise testified that they were led to believe that ABEX was purchasing gold bullion on their behalf, as illustrated in the various statements sent by ABEX to the Murrays. Upon opening the ABEX account the Murrays deposited by wire the sum of $975,000 on or about October 23, 2007 and then another $399,600 of or about November 5, 2007. Each of the statements from ABEX reflected purchase of gold on the Murrays' behalf. [Exhibits "4" and "5"]. On November 21, 2007 the Murrays sold 169 American Gold Eagle gold coins through ABEX and were led to believe ABEX used the $134,693 proceeds to purchase gold bullion as shown in Exhibit "6." On November 28, 2007 the Murrays sold 28 Canadian Maple Leaf gold coins together with another $15,000 cash deposit to purchase gold bullion through ABEX, as shown in Exhibit "7." The monthly account summaries sent to the Murrays by ABEX showed the transactions above and suggested an ABEX account as of November 30, 2007 and December 31, 2007 containing 4300 ounces in gold bullion bars valued at $3,380,058 and 3,571,623, respectively. [Exhibits "39" and "40"]. The Murrays testified that they were led to believe that they could finance purchases of additional gold on credit provided they paid interest and storage charges, which are also indicated on the statements. Indeed, the monthly statements showed the total amount of the account, the "total initial payments" also called a "deposit" as described above, and the "current gross equity" for the account. Significantly, the

---

2. This is clearly at least an overstatement since Mr. Nassbridges also testified to having met Ms. Murray in Washington D.C. for dinner in about March 2008.

ABEX statements each described the holdings as varying quantities of "gold bar .999." [Exhibits 36–42].

One of the principal issues in the case was the nature exactly of what ABEX, through debtor, was buying for the Murrays. The Murrays testified they were told they were buying gold bullion, and certainly this is what is suggested on the face of each of the statements as described above. Debtor and the MF Global documents testify to something else entirely. Debtor testified that what was actually purchased with the Murrays' money was, to his understanding, "due contracts", i.e. a purchase at spot prices but where delivery was expected within 90 days, which debtor asserts is not the same thing as a "futures contract." [3] [Nassbridges Declaration ¶ 27]. On or about October 18, 2007 debtor on behalf of ABEX opened up an account at Man Financial [Exhibit "20"], now known as MF Global, apparently specifically to accommodate the Murrays' purchases of gold. MF Global describes itself as a "futures commission merchant, holding commodity futures trading accounts for its customers" with respect to these transactions. [Exhibit "24"]. Expert James J. Bibbings declares categorically that the documents reflect that what was actually purchased on the Murrays' behalf were gold futures contracts. Significantly, at no relevant time were the Murrays made aware by debtor that their trades were actually being filled by ABEX through MF Global; indeed, the name "MF Global" was entirely unknown to the Murrays until after the fact. The Murrays apparently believed that ABEX had sufficient gold in inventory to clear all trades. Nothing in the evidence suggested that the Murrays were at any time prior to March 2008 made aware that their buy and sell orders in fact had to be executed upon an exchange, and/or that the great bulk of their orders were in fact not held in-house by ABEX at all, but were instead placed upon an exchange through a futures commission merchant, MF Global. There is an oblique reference to "gold contracts" in the "Letter of Consent and Acknowledgement" signed by the Murrays Nov. 14, 2007 [Exhibit "54"] and authority is granted to place sell stop or electronic buy orders on the customers' behalf. But if any explanation was ever made to the Murrays that this meant that ABEX was

---

**3.** The court was given no definition of Mr. Nassbridges' term "due contract" and could find none. The court suspects he means "forward contract" which is in operation very similar to a futures contract. What does "forward contract" mean? Investopedia offers this definition: "A *cash* market transaction in which delivery of the commodity is deferred until after the contract has been made. Although the delivery is made in the future, the price is determined on the initial trade date ... Most forward contracts don't have standards and aren't traded on exchanges. A farmer would use a forward contact to "lock in" a price for his grain for the upcoming fall harvest." In contrast, "futures contract" is defined by Investopedia as follows: "A contractual agreement, generally made on the trading floor of a *futures* exchange, to buy or sell a particular commodity or financial instrument at a predetermined price in the future. Futures contracts detail the quality and quantity of the underlying asset; they are standardized to facilitate trading on a futures exchange. Some futures contracts may call for physical delivery of the asset, while others are settled in cash." Available at http://www.investopedia.com/terms/f/futurescontract.asp. Of course, both futures contracts and forward contracts are often settled for cash prior to actual delivery depending on whether the price of the underlying commodity, which will have normally changed in the interim, results in a profit or loss for the holder of the contract; this has led to a blurring of the lines of distinction between futures contracts and forward contracts in practical terms, and difficulty in coming up with workable regulatory definitions. *See, e.g., CFTC v. Noble Metals Int'l, Inc.,* 67 F.3d 766, 772–73 (9th Cir.1995); *CFTC v. Erskine,* 512 F.3d 309, 317–18 (6th Cir.2008).

merely acting only as an introducing broker[4], and not as a principal on a buy or sale of gold, it did not appear in the evidence. There was also an allegation made in the original complaint filed by the Murrays in the District Court Action, page 5 at ¶ 15(d), that debtor represented he "would use investor's money to purchase gold futures contracts ..." [Exhibit "65"]. This allegation is not consistent with how the Murrays testified in this case and the discrepancy was never explained. But since the complaint was later amended [Exhibit "56"] and was not verified in the first place, the court does not place much weight on the allegation.

Moreover, not only were the covering trades placed by ABEX with MF Global, ABEX also utilized a margin account[5] at MF Global. Debtor contends that he placed orders with MF Global merely as a source for spot trades and that ABEX, had the Murrays fully paid their account, would have arranged delivery of the gold from MF Global. [Exhibit "58"]. Debtor further contends that ABEX used a margin account at MF Global only because the Murrays likewise had not paid their accounts in full, but only maintained a deposit as reflected in the monthly statements, and, one infers, ABEX was not inclined or able to front all of this money.

In the ensuing months the Murrays requested that ABEX continue to "roll over", i.e. leave the substantial balance owed outstanding to ABEX secured by their account and ABEX agreed, continuing monthly to charge both finance charges and possibly storage costs, identified as "carrying costs," which apparently were charged at the rate of 7.9% *per month* [94.8% per annum] as reflected at the bottom of the monthly statements. [Exhibits "38–42"]. In consequence, ABEX also continued to roll over accounts at MF Global. Whether this was at defined additional cost is not clear from the evidence since only some of the MF Global statements were offered into evidence. [Exhibit "23"].

Everything was fine and the price of gold steadily rose from around $761 in October to over $1000 per ounce in March, 2008. The last monthly ABEX statement (with some grounding in reality), for February 2008, showed that the Murrays enjoyed $1,555,177.32 of "equity" in their account and Arla Murray had $57,317.54 "equity" in a separate account. [Exhibits "40" and "47"]. Everything changed abruptly on March 18, 2008 as the price of gold began to plummet. The price of gold futures contracts as quoted at MF Global plummeted from a high of $1003 per ounce to $910 *in two days*, March 18–20. Predictably, MF Global made margin calls upon the ABEX account which apparently were not met and, as the price continued to fall, MF Global *sold out the entire account* on March 20, 2008, leaving a margin *deficit* of $290,428.16. This is reflected in the closing pages of the MF Global statements [Exhibit "23"] and in the lawsuit MF Global brought April 9, 2008 against ABEX. [Exhibit "24"]. Debtor did attempt to mitigate this catastrophe by a series of stop loss orders apparently

4. Investopedia offers the following definition of "introducing broker": "A futures *broker* who has a direct relationship with a client, but delegates the work of the floor operation and trade execution to another futures merchant. The merchant firm is usually a close partner of the IB." http://www.investopedia.com/terms/i/introducingbroker.asp.

5. The trades placed with MF Global were not paid in full by ABEX, only deposits were made. Of course, the terms of the MF Global account required that should the price of the gold drop in value, margin calls could be made to bring the ratio of value to indebtedness within specified limits on pain of liquidation of the account.

placed online 3/18 and 3/19 through a JTrader account assigned to debtor. [Exhibit "29"]. But the stop orders were rejected, or at least were ineffective, for reasons never fully explained. There is a conflict in the evidence over whether ABEX in turn made a margin call demand upon the Murrays. Debtor in his trial declaration at ¶ 30, p. 7, lines 7–8, testifies that such a demand was made, yet in a letter dated April 23, 2008 [Exhibit "26"] it is stated that ABEX declined to make a margin call upon the Murrays. No written evidence of a margin call by ABEX appeared anywhere in the evidence. Strangely, ABEX continued to send statements to the Murrays for March and April 2008 which continued to show that the Murrays enjoyed "equity" of $1,361,782.90 and $1,219,210.63, respectively [Exhibits "41" and "42"], and Arla Murray enjoyed $50,694.58 and $43,032.93 "equity" for the same periods. [Exhibits "48" and "49"]. Where these numbers came from was never explained since, in reality, the entire ABEX account (and all of the Murrays' money) at MF Global was entirely wiped out March 20, 2008. It is possible these numbers represent the number of ounces the Murrays bought multiplied by the spot price of gold, which was quoted about $926.75 on March 25, 2008 on the afternoon London Exchange[6] times 3025 ounces (the number of ounces of gold supposedly still held by the Murrays) = $2,790,804.50.[7] The sum of $927.00 per ounce appears on the ABEX statement as "spot price" which would yield a sum of $2,804,175. In any event, the $1,424,371 balance owed to ABEX continued to be reported on the statements for March and April, 2008 [Exhibits "41" and "42"] plus additional "carrying costs" of $4,652.95 and $13,958.84, respectively.

ABEX sent the Murrays a belated notice of the problem and first introduced the name MF Global by letter of March 26, 2008, which enclosed a "Letter of Acknowledgement" under which ABEX attempted to obtain a "hold harmless" agreement from the Murrays. [Exhibit "25"] Additional explanatory letters were sent April 23, 2008 and April 29, 2008 [Exhibits "26" and "27"]. The Murrays apparently declined to sign the "hold harmless" provision. ABEX filed its Chapter 7 petition on April 23, 2008 and debtor filed his May 9, 2008. These are both "no asset" cases unless the trustees can come up with something based on debtor's arbitration action against MF Global based on the attempts to place stop orders. There were some gold coins in possession of the ABEX estate. But these were determined by the bankruptcy trustee not to be property of the estate as they were identified as owned by particular customers and were returned to them as non-estate property. Manifestly, ABEX when it filed its petition did not have anything like the volume of gold described in the statements sent to the Murrays.

On April 30, 2008, the Murrays commenced a Complaint for Damages and Injunctive Relief against debtor in the United States District Court, case # SACV08–

---

6. USA Gold, http://www.usagold.com/reference/prices/2008.html (last visited Aug. 13, 2010).

7. The arithmetic dos not seem to work out quite correctly, although it is close. For example, if 3025 is multiplied by $922.58, the stated "current value" as appears on the ABEX March, 2008 statement [Exhibit "41"], the resulting sum is $2,790,804.50, not the $2,790,807.53 appearing on the ABEX statement. None of the numbers are precisely equal to the $2,790,807.53 total appearing on the March, 2008 ABEX statement but this may because the spot price from some other exchange such as the Chicago Mercantile Exchange was used on a date not specifically stated, or for some other reason.

00472 AHS ("District Court action") [Exhibit "65"]. Relief of stay was obtained to prosecute the District Court action by order entered on May 4, 2009 [Exhibit "74"] and the complaint was amended by stipulation on July 31, 2009 [Exhibit "57"] as the First Amended Complaint. The First Amended Complaint in the District Court action dropped all references to fraud or intentional torts and ultimately a judgment for damages based on negligence was entered in favor of the Murrays in the District Court Action December 14, 2009 [Exhibit "68"]. The Complaint to Determine Dischargeability was filed August 18, 2008.

## 2. Individual Liability for Corporate Action

█ Debtor argues in his Trial Brief that he cannot be held liable since he at all times acted solely on behalf of his corporation ABEX. There is no substance to this argument. As even debtor acknowledges, an individual faces liability for tortious acts in which he participates. *Bombardier Corp. v. Penning (In re Penning)*, 22 B.R. 616, 619 (Bankr.E.D.Mich.1982). There is no question in the evidence but that the acts which are alleged to create non-dischargeable liability are those *of the debtor himself,* and are not dependent in any small part on the acts of third parties. The fact that debtor may have acted for his wholly-owned corporation, ABEX, is of no consequence as he is equally liable.

## 3. Judicial Estoppel

█ Debtor argues that the doctrine of judicial estoppel should apply here to bar any recovery under this adversary proceeding. Debtor bases this argument on the language of the Stipulation permitting the filing of the First Amended Complaint in the District Court Action [Exhibit "57"] wherein the Murrays allegedly admitted there was no factual basis for an action in fraud. First, the authorities cited by the debtor are more nuanced and equivocal. The doctrine of judicial estoppel may be invoked to prevent a pleader from asserting claims inconsistent with claims previously asserted with success by that party. *See, e.g., New Hampshire v. Maine,* 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). The purpose of the doctrine is to prevent a perversion of the judicial process. But the court in considering application of the doctrine is to look at a multi-part test; the first element is whether the later position is "clearly inconsistent" with the earlier position. Second, the court must inquire as to whether the party to be estopped succeeded in convincing the court to accept the earlier position such that judicial acceptance of the inconsistent position would create "the perception that either the first or the second court was misled." *Id.* at 750, 121 S.Ct. 1808 citing, *Edwards v. Aetna Life Ins. Co.,* 690 F.2d 595, 599 (6th Cir.1982). There is nothing in the record that persuades the court that the District Court was in any way misled in reaching its judgment about the existence of, or absence of, fraud. Further, the Stipulation by its own language is at best equivocal. At ¶ 4 it provides: "Upon review of the initial disclosure documents, Plaintiffs believe their damages were caused by certain negligent acts or omission of Defendant as an officer of ABEX CORP. and not by any fraudulent or unlawful business activity." [Exhibit "57"] This statement allows the possibility that fraud might still be alleged since only "initial disclosure documents" are offered as the basis for this initial position. It must be said, at the very least, that the adversary proceeding is not "clearly inconsistent" with this recital as it might always develop that more facts or research could still lead to a different conclusion. In sum, there is no basis for

applying the doctrine of judicial estoppel here.

### 4. Claim Preclusion

█ Debtor also argues that the Murrays have improperly split their case in that the doctrine of collateral estoppel holds that a judgment is preclusive not only of what was actually litigated but what should have been joined as arising from the same nucleus of facts. The cases cited by debtor, however, are significantly distinguishable from the case at bar. Debtor cites to *Aespace America, Inc. v. Ping–Yau Ko (In re Ping Yau Ko)*, 2006 Bankr.Lexis 3025 (Bankr.C.D.Cal.2006). In *Aespace* there was a pre-petition multi count action, including for fraud against the debtors. Jury instructions were given articulating the elements of the various theories for relief. The verdict came back for defendants on the fraud count but for the plaintiff on a count for negligent misrepresentation. The defendants later filed a bankruptcy petition and a non-dischargeability adversary proceeding followed. In cross motions for summary judgment based on collateral estoppel, the bankruptcy court noted that the jury instruction on the critical issues of scienter required for non-dischargeability, was absent concerning the negligent misrepresentation count. Consequently, the bankruptcy court held correctly that the negligent misrepresentation count was insufficient as a "sword" for purposes of 11 U.S.C. § 523(a)(2) under the doctrine of collateral estoppel. Plaintiff argued that it should be able to introduce other versions of fraud than the "fraudulent concealment" presented to the jury. But the bankruptcy court held that since the plaintiff had had a full and fair opportunity to litigate the issues of fraud in state court, the jury's verdict against them was collateral estoppel on the issue for purposes of the adversary proceeding in bankruptcy, and that trying to introduce variant theories of fraud was now precluded by the doctrine of claim preclusion which is a wider concept than mere issue preclusion. *Id.* at *14

█ *Aespace* is fundamentally different from the case at bar. First, unlike *Aespace* there was no judgment rendered prior to the filing of this adversary proceeding which could be considered collateral estoppel. The District Court judgment came well after this case was filed. The doctrine of *res judicata* bars a party from bringing a claim if a court of competent jurisdiction has rendered final judgment on the merits of the claim in a previous action involving the same parties or their privies. *Davis v. Yageo Corp.*, 481 F.3d 661, 680 (9th Cir.2007) *citing Robertson v. Isomedix, Inc. (In re Int'l Nutronics, Inc.)*, 28 F.3d 965, 969 (9th Cir.1994). Second, bankruptcy courts have exclusive jurisdiction over non-dischargeability actions brought pursuant to section 523. 28 U.S.C. § 157(b)(2)(I); *Sasson v. Sokoloff (In re Sasson)*, 424 F.3d 864, 869 (9th Cir.2005). The issue of the dischargeability of Defendant's debt to Plaintiffs could not have been raised in the District Court Action unless there had been a withdrawal of the reference under 28 U.S.C. § 157(d). Indeed, the only theory close to dischargeability was fraud and that was specifically dropped by stipulation from the District Court Action. As a result, the issue had not been *actually litigated* for collateral estoppel purposes and a judgment on the merits of the claim has not been entered for *res judicata* purposes, and debtor advances no logical reason why the Murrays should have been obliged to litigate the issues of fraud, etc. before the District Court.

█ Nor is the claim preclusion theory of debtor persuasive. The Supreme Court in *Brown v. Felsen*, 442 U.S. 127, 131–38,

99 S.Ct. 2205, 60 L.Ed.2d 767 (1979) held that the claim preclusion doctrine of *res judicata* should not bar litigation in bankruptcy court for dischargeability purposes where the underlying issue, such as fraud, could have been, but was not actually litigated in another court. This is distinct from cases like *Aespace* where there actually was a full trial on the issue of fraud in the other court and found as a matter of disputed fact against the plaintiff.

Even less persuasive is the citation to *George v. City of Morro Bay (In re George)*, 318 B.R. 729 (9th Cir. BAP 2004). *George* did not involve dischargeability issues but instead was based on the anti-discrimination provisions of § 525. Therefore, since dischargeability litigation raises unique concerns and the bankruptcy court is, ordinarily, the sole forum for such litigation, as discussed in *Brown v. Felsen*, litigation concerning § 523(a) represents one of the acknowledged exceptions to the general rule concerning splitting of claims as referenced even in *George*. *Id.* at 738, *citing* RESTATEMENT (SECOND) OF JUDGMENTS § 26(1)(c)-(d). Further, since no claim based on fraud was prosecuted to final judgment in the District Court Action, the General Rule of Bar does not apply either. *Id., citing* RESTATEMENT (SECOND) OF JUDGMENTS § 20.

### 5. 11 U.S.C. § 523(a)(2)(A) [actual fraud]

■ The major issue in the case is whether the elements of fraud were proven. We can use debtor's own citation for a list of those elements. Plaintiffs must show all of the following: (a) the debtor made a misrepresentation or fraudulent omission, or engaged in deceptive conduct; (b) at the time of the representation or conduct described in (a) the debtor knew it to be false or deceptive; (c) the debtor made the representation with the intent and purpose of deceiving the plaintiff(s); the plaintiff(s) justifiably relied on the representation; and (e) the plaintiff(s) sustained a loss or damage as the proximate consequence of the representation having been made. *Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman)*, 234 F.3d 1081, 1085 (9th Cir.2000).

■ The Murrays contend, and debtor denies, that he told them in their September 2007 telephone conference they were buying gold bullion. The Murrays fervently deny that they were told they were investing in gold futures of any kind; they contend they were led to believe by debtor and ABEX that they were investing in actual metal bars, not some kind of promise to sell gold and deliver later. If debtor did not specifically inform them of this fact, then this is a material omission for reasons explained below. Debtor is more equivocal on this point. He asserts that ABEX did not exactly invest the Murrays' money in gold futures with MF Global (contrary to what the expert Mr. Bibbings and the salesman Mr. Lund testified and which is reflected plainly on the face of MF Global's lawsuit) but instead he thought they were "due contracts" [his term] which apparently means "forward contracts," where delivery was expected in the future, perhaps ninety days although the delivery timetable was never explained in the evidence. There is much lack of clarity in the case law over the difference between futures contracts and forward contracts because, in practice, they are often treated very much the same, i.e. the delivery is never actually taken but settled for cash before delivery date with the holder of the contract either making a profit or taking a loss depending on where the spot

price has moved in meantime.[8] Most of the cases in the area arise out of CFTC enforcement litigation because the trade in commodity futures is highly regulated under the Commodity Exchange Act, but there was a "cash forward contract" exclusion at former 7 U.S.C. § 2(a)(1)(A) (1988) [now 7 U.S.C. § 1(a)(1, 9) ]. Expert James Bibbings concludes these were futures trades and, moreover, were illegal contracts because neither ABEX nor debtor was properly licensed to operate in this way. At best, Bibbings concludes, ABEX was an introducing broker but then the trades with MF Global should have been denominated in the Murrays' names and ABEX should not have accepted the money from the Murrays.

But whether these were or were not illegal contracts, or were or were not futures contracts or forward contracts, is largely beside the point. They were *very risky* contracts, not the least because they were also MF Global accounts *on margin.* By use of a margin account ABEX was able to control gold contracts of many times the face value of the actual money deposited. The evidence was not clear as to exactly the face amount of gold contracts in the margin account ABEX held with MF Global because, among other things, the MF Global statements are incomplete [Exhibit "23"] and no clarifying testimony was given. But as Mr. Bibbings testified at ¶ 12 of his trial declaration, the margin rate on futures accounts is often much lower than most investment ac-

counts, sometimes as little as 1 to 21. This means that for only a fraction of the total value of an account, say $5,700, an investor can control an account with a face value of $121,000. But the downside of this is that it does not take much change in the price of the commodity to require a margin call from the futures commission merchant like MF Global to bring the account back within margin limits; the more leveraged the margin account the more extreme is the effect of any downward movement in the commodity. So, it is not altogether surprising that when gold began its precipitous fall on March 18, 2008 immediate action to sell sufficient portions to maintain margin would have been required to save the account from immediate wholesale liquidation by MF Global.[9] But the point is that the Murrays were entirely ignorant of the extreme jeopardy their investment had been placed in by ABEX and debtor. They had not bargained for this kind of danger and stress of being subject to a complete wipeout in only two days over an 8% movement in the price of gold. The Murrays thought they were buying bullion, and even if some margin payment would have been necessary to bring them back into margin limits with ABEX, there should have been enough value there to do so had the actual metal been purchased on spot or been on-hand. It appears that gold suffered about an 8% drop over two days between March 18 and 20, 2008, from a high of just over $1000 to about $922 on March 20, before rising again later.[10] Uti-

8. *Compare CFTC v. Noble Metals Int'l, Inc.,* 67 F.3d 766, 772–73 (9th Cir.1995); *CFTC v. Erskine,* 512 F.3d 309, 317–18 (6th Cir.2008); *CFTC v. Petro Marketing Group, Inc.,* 680 F.2d 573(9th Cir.1982); *Krommenhoek v. Mark Precious Metals, Inc. (In re Bybee),* 945 F.2d 309 (9th Cir.1991).

9. Debtor will argue that he tried to staunch the losses by using computerized stop orders but, for reasons never explained, these were ineffective. But this is not a defense. The

Murrays never bargained for being placed in this kind of immediate and acute jeopardy, and just because debtor was unable to use his remedy to save matters does not excuse the taking of this extreme and unauthorized risk in the first place.

10. The spot price as of this writing was $1215 per ounce.

lizing the numbers appearing on the March ABEX statement [Exhibit "41"] this should have meant the account would have been around $2,789,050 at its lowest point after reaching about $3,500,000 in early March 2008. Since the balance owed ABEX was reflected at $1,424,371 there should have been no point in March 2008 when the account would not still have about a 2 to 1 margin. Even if some gold had to be sold there should have been no need for panic. But, of course, there was no (or relatively little) gold actually on hand at ABEX.

In evaluating which version of the September 2007 conversation to believe the court looks to the surrounding circumstances. First, there is nothing in any of the ABEX agreements or brochures that suggests that the transactions were to be anything other than purchase of gold bullion. Futures or forward contracts are not mentioned. Indeed, many provisions of the ABEX documents strongly suggest the contrary. For example, as debtor has argued, the Murrays signed what amounts to a security agreement in their account to secure the balance owed ABEX [Exhibit "3"]. ABEX was empowered there under to liquidate this security interest had demand for the balance owed on the margin account not been met. But a security interest in what? There was little or no gold on hand to which the security interest might attach (although had there been this provision would have made some sense). Moreover, the ABEX agreement provides (as do each of the monthly statements) that title remained in ABEX until the account was fully paid, so one wonders what if anything this security interest might have attached to? At most one might think "contact rights" but actually the gold futures or forward contracts were not even denominated in the Murrays' name at all but were at all times held in ABEX's name at MF Global. ABEX was also careful to document both in its "Abex Storage Account and Precious Metals Buy/Sell Disclaimer and Disclosure" [Exhibit "3"] as well as on the bottom of each monthly statement [Exhibits "39–49"] that gold was held in an undifferentiated and fungible store, not identified to any customer, with title remaining in ABEX until paid for in full. In sum, the very protective measures required by ABEX strongly implied actual possession of gold by ABEX, *not futures or forward contracts* under which ABEX possessed nothing. Then there is the troubling question of "carrying costs" as appears on the bottom of each ABEX statement. To the extent this was supposed to include storage charges, as was referenced in some testimony and appears at the bottom of the statements, storage of what? Moreover, each ABEX statement specifically references "gold bar .999" under "description" and the sales confirmation script, which was scrupulously read to the Murrays just after each trade, references "gold bullion." [Exhibit "28"].

By no stretch of the imagination do these references amount to disclosure that actually the Murrays monies were being used to buy futures (or even forward contracts) on a highly leveraged account at MF Global. The closest debtor can come is the vague reference to "purchase of gold contracts within 90 days delivery time" found at the Letter of Consent and Acknowledgement signed by the Murrays when the margin account with ABEX was opened November 14, 2007. [Exhibit "54"] But this does not amount to suitable disclosure of what was really happening, i.e. ABEX was buying risky futures or forward contracts in a heavily margined account from MF Global, particularly when the monthly statements even after the date of the Letter of Consent and Acknowledgement continued to reference "gold bar .999". The court is also influ-

enced by the fact that ABEX continued to send statements to the Murrays for March and April, 2008 [Exhibits "41", "42" "48" and "49"] which still made no reference to the fact that the entire MF Global account had been wiped out. Debtor even met Ms Murray in Washington D.C. for dinner in late March 2008 and said nothing about MF Global. Instead, this looks to the court like ABEX trying to cover up until some kind of alternative remedy could be found. It does not look to the court like the behavior of a reputable gold dealer with nothing to apologize for because its client had been suitably informed of the risks undertaken. These look like the acts of someone quite reluctant to face up to the reality of the situation with a client that had not been informed. Exactly why the debtor did this is not clear; it may have been because ABEX had neither the wherewithal nor inclination to extend a margin account to its clients without engaging in such risky behavior, or it might be because ABEX was speculating with its clients' money, which seemed a quick way to riches so long as the Murrays were only margined 2 to 1, while debtor could margin many times this amount on a futures account. This would work so long as the price of gold continued to rise, and presumably debtor thought he was nimble enough or sophisticated enough to avoid the downside if it came. But in either event, failure to inform the Murrays of the jeopardy they were being placed in was fraudulent.

In sum, the court finds that:

(1) debtor either stated falsely to the Murrays that the Murrays' money was going to be used to buy gold bullion, or failed to disclose that their monies were actually being sent to MF Global to invest in a highly leveraged and risky futures or forward contracts margin account. This was very material information concerning the degree of risk inherent in the transaction;

(2) debtor knew at the time he made this statement that it was false or deceptive and/or that the information not disclosed was highly material and that the ABEX materials given the Murrays were therefore very deceptive;

(3) debtor made these statements, or failed to inform the Murrays, with intent that they be deceived since the Murrays never would have agreed to this level of risk as the debtor well knew;

(4) the Murrays reasonably relied upon these statements or reasonably relied upon the ABEX brochures and sales scripts, etc., in believing they were buying gold bullion; and

(5) the Murrays were proximately damaged by these misstatements or failures to disclose in that their entire net investment was wiped out, in the amount of $1,546,523.[11]

### 6. 11 U.S.C. § 523(a)(4) [Embezzlement, Fraud or Defalcation While Acting in a Fiduciary Capacity]

 The court believes that debtor was acting as a fiduciary respecting the Murrays. Despite the disclaimer in the ABEX documents that ABEX was not a fiduciary and even mindful that the agreement provides that the Murrays' account was to be self-directed, the reality is that debtor undertook to "watch out" for the Murrays and followed the gold prices carefully. Ms. Murray testified that many of the buy orders were placed overnight by

---

**11.** It is not entirely clear what is the arithmetic behind this number since the "equity" amount shown on the March 2008 ABEX statements for Arla Murray and the Murrays together would amount to only about $1,412,476.58. This might be reflective of the early March rise in spot gold prices. But it is both the number appearing in the prayer and in the District Court judgment [Exhibit "68"] and so is adopted here.

debtor and then confirmation was sought from the Murrays in the next day. Indeed, debtor apparently attempted to place stop orders on their behalf March 18, 2008 as well, although these proved ineffective. The Murrays clearly reposed great confidence in debtor to protect their interests and relied upon his expertise by entrusting over $1,500,000 to him through ABEX. There were promises made at least orally that the Murrays property would be segregated and safely invested. These are the hallmarks of a fiduciary relationship since there was great repose of confidence between a client and a more sophisticated investment broker, and there was a trust *res*. This is a different case from cases like *National Gold Exchange v. Stern (In re Stern)*, 403 B.R. 58, 66 (Bankr.C.D.Cal. 2009) where the court discussed that not all commercial relationships, even those which contain some aspects of trust, necessarily amount to a fiduciary relationship for purposes of § 523(a)(4). The reality is that debtor took the Murrays monies under fiduciary circumstances and then gambled with it. So the court has no difficulty in finding that the obligation should be non-dischargeable as well under § 523(a)(4) because that fiduciary relationship was violated by debtor's fraud and defalcation.

The Murrays also argue that debtor embezzled the sums of $300,000 on or about October 30, 2007 and in the same amount again on or about November 2, 2007. Debtor argued he was entitled to take monies from the ABEX accounts for "reimbursements" through RE Lloyd, a company he controlled, as he had to repay a mortgage on his house used to fund the ABEX business. It just so happened to be on the days that the monies were received from the Murrays by ABEX. Whether any other payments from ABEX to MF Global might have "caught up" for these payments so that all of the Murrays' money was ultimately accounted for at MF Global is left unclear in the evidence. This is all very dubious to the court but the court is not convinced that an adequate tracing appears in the evidence in order to make a finding on the issue of embezzlement.

### 7. 11 U.S.C. § 523(a)(6) [Willful and Malicious Injury]

In order to prevail on this theory the Murrays must show that debtor actually and subjectively intended to injure them or engaged in conduct from which he knew such injury was nearly certain to occur. *Su v. Carrillo (In re Su)*, 259 B.R. 909, 913–14 (9th Cir. BAP 2001). There is no evidence of this. Rather, the evidence showed that debtor hoped that the price of gold would continue to rise to everyone's profit and/or that he would be nimble enough to catch any fluctuations downward with a stop order. But things went disastrously wrong. It cannot be fairly said that he knew this catastrophe was nearly certain to occur as might suggest a malicious motive. Rather, it can only be said that debtor had no right to expose the Murrays to this undisclosed risk. But the intentional aspect is missing sufficient for a finding sufficient to fulfill § 523(a)(6).

### 8. Conclusion

As the ABEX materials themselves provided, as quoted at page 2 of this opinion, there is a world of difference between actually possessing gold and having a contract to purchase gold, whether that be in future or only for future delivery. Manifestly, the second scenario is riskier as it depends on fulfillment of contingencies, the *bona fides* of the counter-party and movement of the interim spot price. Risk is magnified geometrically when those contracts are subject to margin calls, particularly when the underlying commodity price is subject to free fall, as sometimes happens. Debtor took the Murrays' money on one set of assumptions and then invested it

under an entirely different set. Even professional gamblers may think they are sophisticated or nimble enough to beat the house every time, but they only have the right to lose their own money, not other peoples' money absent clear and informed consent to play the game. It is entirely correct, just and consistent with the principles of the bankruptcy code that the obligation of debtor to the Murrays be declared non-dischargeable under 11 U.S.C. §§ 523(a)(2) and (a)(4). The plaintiffs may submit a form of judgment consistent with this Statement of Decision which adopts this Statement as findings as required under F.R.Civ.P. 52(a), adopted herein under FRBP 7052(a).