**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| HENDRICKS & LEWIS PLLC, a Washington professional limited liability company, *Plaintiff-Appellee*, | No. 13-35010 D.C. No. 2:12-cv-00841-RSL |
| v. | |
| GEORGE CLINTON, an individual, *Defendant-Appellant*. | OPINION |

Appeal from the United States District Court
for the Western District of Washington
Robert S. Lasnik, District Judge, Presiding

Argued and Submitted
February 4, 2014—Seattle, Washington

Filed June 23, 2014

Before: Raymond C. Fisher, Ronald M. Gould,
and Morgan Christen, Circuit Judges.

Opinion by Judge Christen

## SUMMARY*

### Copyright

The panel affirmed the district court's order appointing a receiver and authorizing the sale of master sound recording copyrights in an action between musician George Clinton and his former law firm Hendricks & Lewis.

Hendricks & Lewis obtained judgments against Clinton for past-due attorneys' fees, and moved for an order authorizing the sale of master recordings made by Clinton to satisfy the judgments.

The panel held that under Washington law Clinton's copyrights in the masters were subject to execution to satisfy judgments made against him. The panel also held that § 201(e) of the federal Copyright Act did not protect Clinton from the involuntary transfer of his copyrighted works. The panel further held that under Washington law the district court did not abuse its discretion by appointing a receiver to manage or sell ownership of the copyrights. The panel held that Clinton may raise claims of fraud on the court and judicial estoppel for the first time on appeal, but concluded that both claims were meritless. Finally, the panel held that Clinton failed to raise his preemption, *Erie* doctrine, and due process arguments before the district court, and, therefore, they would generally not be considered, and in any event they were without merit.

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Eric Michael Fong (argued), Fong Law, Port Orchard, Washington, for Plaintiff-Appellee.

Katherine Hendricks (argued), Hendricks & Lewis, Seattle, Washington, for Defendant-Appellant.

**OPINION**

CHRISTEN, Circuit Judge:

George Clinton appeals the district court's order appointing a receiver, assigning four master sound recording copyrights to the receiver, and authorizing the receiver to use the copyrights to the extent necessary to satisfy monetary judgments a law firm obtained against him. Clinton also raises several issues for the first time on appeal, including fraud on the court and judicial estoppel. We have jurisdiction under 28 U.S.C. § 1291 and we affirm.

## I.  FACTS

### A.  H&L's Judgments Against Clinton

George Clinton is a musician, bandleader, and touring performance artist. Hendricks & Lewis (H&L) is a law firm that represented Clinton in various disputes from March 2005 to August 2008. H&L billed Clinton $3,341,650.32 for its work, received $1,000,578.87 in payment, and wrote off approximately $600,000 of the remaining balance. This left $1,779,756.29 due. H&L initiated arbitration to secure payment of the balance, and an arbitration panel issued an

award in favor of H&L.  Clinton did not participate in the arbitration proceedings.  H&L petitioned the Western District of Washington for an order confirming the arbitration award, and, in May 2010, the district court entered judgment for H&L against Clinton in the amount of $1,675,639.82, plus interest.  The court entered a second judgment awarding H&L an additional $60,786.50 in attorneys' fees and costs in July 2010.

## B.  H&L's Judgment Collection Efforts

H&L pursued a variety of judgment collection efforts, including garnishments, levies, and liens in several districts across the country.  Clinton's attorney declared that these actions created a financial "stranglehold" so that Clinton "[c]an't pay his taxes.  Can't pay his lawyers.  Now, it is going to affect his touring and his ability to make a living at 72 years old."

## C.  Ownership History of the Masters

In July 1975, Clinton, through his production company, Thang, Inc., entered into a recording contract with Warner Bros. Records in which Clinton agreed to make master recordings of his performances with the group Funkadelic ("the Masters").  Clinton had previously entered into a valid and binding agreement with Thang to render his services as a recording artist solely and exclusively for Thang.

The recording contract between Thang and Warner Bros. provided that Warner Bros.:

> shall own in perpetuity throughout the world all right, title and interest in and to all the

results and proceeds of [Thang's] and [Clinton's] services and performances hereunder, including the sole and exclusive ownership of any and all masters . . . , the copyrights therein throughout the universe, and the right to extend or renew such copyrights, and [Thang] and [Clinton] acknowledge that they shall at no time have any right, title or interest in the foregoing.

The agreement further provided that Thang:

acknowledges and agrees that [Warner Bros.] is and shall be the owner of all rights of copyright in records embodying the results and proceeds of [Clinton's] services . . . , including the exclusive right to copyright same as "sound recordings" in the name of [Warner Bros.] to renew and extend such copyrights (it being agreed that for this purpose [Thang] and [Clinton] are deemed [Warner Bros.'s] employees for hire) and to exercise all rights of the copyright/proprietor thereunder. To the extent, if any that [Thang] or [Clinton] may be deemed an "author" of such "sound recordings", [Thang] and [Clinton] further grant to [Warner Bros.] a power of attorney, irrevocable and coupled with an interest for [Thang] and [Clinton] and in [Thang] and/or [Clinton's] name, to apply for and obtain and on obtaining same, to assign to [Warner Bros.], all such renewal copyrights.

Clinton signed a substantially similar agreement with Warner Bros. in May 1979. Under these agreements, the Masters at issue in this appeal—"Hardcore Jollies," "One Nation Under a Groove," "Uncle Jam Wants You," and "The Electric Spanking of War Babies"—were created, and Warner Bros. registered the copyrights in those recordings as "works made for hire" in its name as author.

In August 1982, to resolve a separate dispute involving Clinton, Warner Bros., and other parties, Clinton and Warner Bros. entered into a settlement agreement under which Warner Bros. agreed to "relinquish its ownership of the Clinton Masters" at issue in this appeal, if or when Clinton entered into an agreement with a third party to distribute and sell records produced from the Masters. Clinton's ownership of the Masters was eventually confirmed through litigation in 2005 when the Central District of California issued an order that Clinton "is the sole owner of [the Masters] and has been the sole owner of the Masters since 1993." Clinton subsequently sued third parties for copyright infringement of the Masters.

## II. PROCEDURAL HISTORY

In July 2011, approximately one year after H&L secured its judgments for past-due attorneys' fees against Clinton, Clinton sued H&L in the Western District of Washington alleging various theories of legal malpractice. H&L asserted judgment collection counterclaims and moved for an order authorizing the sale of the Masters to satisfy the judgments it had secured against Clinton. In April 2012, H&L initiated a separate action in the Western District of Washington seeking an order for a judgment debtor examination of Clinton. H&L subsequently filed a motion in this separate action for the

appointment of a receiver and for an order directing the assignment of the Masters to the receiver. H&L's counterclaims in the malpractice action were severed and consolidated with the action initiated by H&L, which is at issue here.[1]

In November 2012, the district court found that "[d]espite numerous efforts to enforce [the subject] judgments in this and other district[s], plaintiff has recovered less than $340,000." The district court appointed a receiver in an order specifying that the receiver:

> shall have all of the rights, powers, duties, and authority vested in him under [applicable Washington law], including but not limited to authority and control over the Funkadelic master sound recordings "Hardcore Jollies," "One Nation Under a Groove," "Uncle Jam Wants You," and "The Electric Spanking of War Babies," in order to maximize the value of the sound recordings for the benefit of the parties and to make whole the judgment creditor, [H&L]. Receiver shall, to the greatest extent possible, maximize the income stream from the Funkadelic master sound recordings without selling or otherwise permanently disposing of the copyrights. Ideally, the Receiver will utilize the copyright and sound recordings over a one or two year

---

[1] The district court subsequently dismissed Clinton's legal malpractice claims, and this court affirmed that ruling. *See Clinton v. Hendricks & Lewis PLLC*, No. 12-35791, 2014 U.S. App. LEXIS 3131 (9th Cir. Feb. 20, 2014).

> period to satisfy the judgments and pay the expenses of the receivership before returning the copyrights and master sound recordings to [Clinton].  *Notwithstanding the Court's preference for returning the recordings and copyrights to* [Clinton] *after his debts are satisfied, the Receiver has the authority to sell or permanently dispose of any or all of the master sound recordings*.

(Emphasis added).  The district court also ordered that it would have to pre-approve any sale of the Masters.[2]

In entering its order, the district court considered the text and legislative history of Copyright Act § 201(e), which protects individual authors from the involuntary transfer of their copyrights.  The district court ruled that Clinton was not entitled to § 201(e) protection because he "is either an assignee of the original author or he has previously transferred the copyrights voluntarily."  The district court noted that the initial agreements between Warner Bros. and Clinton, and between Warner Bros. and Thang, specifically granted the copyrights in the sound recordings to Warner Bros.  The court concluded that Warner Bros. was the original "author" of the Masters under both the Copyright Act and the parties' contract, and that Clinton was not eligible for protection under § 201(e) of the Copyright Act.  The district court reasoned that Clinton, who obtained ownership of the Masters in 1993, is an assignee, not the author for purposes of the Act.  In the alternative, the court reasoned that even if it found Clinton was the original author, he voluntarily

---

[2] Neither of the parties challenged the qualifications of the court-appointed receiver.

transferred the copyrights to Warner Bros., thus making himself ineligible for protection under § 201(e). Finally, the district court concluded that the Masters recording copyrights, like any other species of non-exempt personal property, are subject to judicial sale or assignment to satisfy a judgment.

Clinton appeals.

## III.   DISCUSSION

"We review *de novo* the district court's interpretations of the Copyright Act." *Rossi v. Motion Picture Ass'n of Am. Inc.*, 391 F.3d 1000, 1002–03 (9th Cir. 2004). The appointment of a receiver is reviewed for abuse of discretion. *See Cameron v. Groveland Improvement Co.*, 54 P. 1128, 1128 (Wash. 1898); *King Cnty. Dep't of Cmty. & Human Servs. v. Nw. Defenders Ass'n*, 75 P.3d 583, 586 (Wash. Ct. App. 2003). "Because a court invokes judicial estoppel at its discretion, we review the application of judicial estoppel to the particular facts of a case for abuse of discretion." *Johnson v. Oregon*, 141 F.3d 1361, 1364 (9th Cir. 1998).

### A.  Clinton's Copyrights in the Masters are Subject to Execution to Satisfy Judgments Entered Against Him.

Federal Rule of Civil Procedure 69(a) governs execution proceedings. It provides:

> [t]he procedure on execution—and in proceedings supplementary to and in aid of a judgment or execution—must accord with the procedure of the state where the court is

> located, but a federal statute governs to the
> extent it applies.

Fed. R. Civ. P. 69(a)(1). We therefore look to Washington law, which generally allows money judgments to be enforced by execution: "All property, real and personal, of the judgment debtor that is not exempted by law is liable to execution." Wash. Rev. Code § 6.17.090. Washington law does not specifically address whether copyrights, like other types of property, are subject to sale or assignment in order to satisfy a judgment, but federal law establishes that copyrights are alienable. 17 U.S.C. § 201(d)(1) provides that "[t]he ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law."

We know of no federal statutory law directly addressing whether copyrights are subject to execution to satisfy a judgment. Both H&L and the district court relied on federal common law, specifically *Ager v. Murray*, 105 U.S. 126 (1881). The *Ager* court ruled that if a patent holder refused to assign his patent to satisfy a judgment entered against him, the trustee was authorized to execute the assignment on his behalf. *Id.* at 132. Though *Ager* involved a patent rather than a copyright, the district court's analogy to patent law is rooted in our case law. Our court has said that where copyright case law is lacking, "it is appropriate to look for guidance to patent law 'because of the historic kinship between patent law and copyright law.'" *Harris v. Emus Records Corp.*, 734 F.2d 1329, 1333 (9th Cir. 1984) (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 439 (1984)). Indeed, *Ager* itself discusses patents and copyrights in tandem. *See* 105 U.S. at 127–28 ("[T]he provisions of the patent and copyright acts, securing a sole and exclusive right to the patentee, do not exonerate the right and property . . .

from liability to be subjected by suitable judicial proceedings to the payment of his debts."). The authority cited by the district court is helpful, but Rule 69 requires that state law controls execution proceedings absent express statutory authority, not federal common law. *See* Fed. R. Civ. P. 69(a)(1).

Our court confronted an analogous issue in *Office Depot, Inc. v. Zuccarini*, 596 F.3d 696 (9th Cir. 2010), where we considered whether internet domain names are subject to execution in California. Consistent with Rule 69, in *Office Depot* our court first looked to California law because there is no specific federal statute addressing whether domain names may be the subject of judgment execution efforts. Because California law permits writs of execution against intangible assets generally, and because domain names are intangible personal property, we held that internet domain names are subject to execution in California. *Id.* at 701–02.

Here, Rule 69 required that the district court look to Washington law in the absence of a federal statute addressing whether copyrights may be subject to execution procedures, and Washington law provides that "all property, real and personal," is subject to execution. *Johnson v. Dahlquist*, 225 P. 817, 818 (Wash. 1924). This rule, known as the "*Johnson* rule," was first articulated when a previous version of Wash. Rev. Code § 6.17.090 was in effect, but, subject to narrow exceptions that are not applicable here, Washington courts continue to follow it. *See MP Med. Inc. v. Wegman*, 213 P.3d 931, 935–36 (Wash. Ct. App. 2009). As *Ager* recognizes, copyrights, like patents, are a form of intangible personal property. 105 U.S. at 129–30. Therefore, unless an exception or exemption applies, Washington law permits H&L to execute against Clinton's copyrights in the Masters.

Clinton challenges the district court's reliance on Washington's admittedly broad and general execution statutes and the district court's analogy to patent law. He argues that § 201(e) of the Copyright Act precludes H&L's execution efforts. For the first time on appeal, he also argues that § 304(c) of the Copyright Act prohibits execution against his copyrights because he enjoys the inalienable right to terminate the assignment of his copyrights to Warner Bros.[3] As discussed below, both arguments fail.

**B. Copyright Act § 201(e) Does Not Protect Clinton from the Involuntary Transfer of His Copyrighted Works.**

Clinton argues that § 201(e) of the Copyright Act protects the subject copyrights from H&L's judgment collection efforts. Neither the statute's plain text nor its legislative history supports Clinton's argument.

We begin with the statutory language. Section 201(e) provides:

> When *an individual author's* ownership of a copyright, or of any of the exclusive rights under a copyright, *has not previously been transferred voluntarily* by that individual author, no action by any governmental body or other official or organization purporting to seize, expropriate, transfer, or exercise rights of ownership with respect to the copyright, or any of the exclusive rights under a copyright,

---

[3] 17 U.S.C. § 304(c) sets out the conditions under which transfers and licenses to copyrights are subject to termination.

shall be given effect under this title, except as
provided under title 11.

17 U.S.C. § 201(e) (emphases added).  A leading authority on
copyright law explains:

> The stated purpose of this prohibition was to
> "protect foreign authors against laws and
> decrees purporting to divest them of their
> rights under the United States copyright
> statute, and would protect authors within the
> foreign country who choose to resist such
> covert pressures." More particularly it was
> feared that the Soviet Union, by its accession
> to the Universal Copyright Convention on
> February 27, 1973, would be enabled to
> enforce censorship in the United States of the
> works of its dissident authors through the
> device of seizing the ownership of such
> works, and then by enforcing the American
> copyright therein, enjoin any public
> distribution within the United States.

3 Melville B. Nimmer & David Nimmer, *Nimmer on
Copyright* § 10.4 (footnote omitted).  The legislative history
of § 201(e) explains that "[t]he purpose of this subsection is
to reaffirm the basic principle that the United States copyright
of an individual author shall be secured to that author, and
cannot be taken away by any involuntary transfer."  H.R.

Rep. 94-1476, at 123 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5739.[4]

Section 201(e) is of no help to Clinton because he is not the "author" of the Masters within the meaning of the Copyright Act. Thang specifically agreed in its 1975 contract with Warner Bros. that Warner Bros. would be the sole owner of the master recordings resulting from the parties' contract. Thang and Clinton were "deemed [Warner Bros.'s] employees for hire" in the same contract.[5] As noted, the parties signed a substantially similar agreement in 1979, and it is uncontested that all four Masters were created under these agreements. 17 U.S.C. § 201(b) provides: "[i]n the case of a work made for hire, the employer or other person for

---

[4] The statute permits court ordered transfers to pay off creditors in Title 11 bankruptcy proceedings. Neither party argues that this affects the outcome of the appeal, but it is consistent with our general ruling that, at least in circumstances where special exemptions or protections do not apply, copyrights are intangible property subject to judgment collection efforts.

[5] The Copyright Act defines a work made for hire as:

> (1) a work prepared by an employee within the scope of his or her employment; or

> (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

17 U.S.C. § 101.

whom the work was prepared is considered the author for purposes of [the Copyright Act], and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." Warner Bros. registered the Masters as "works made for hire" within five years of publication, listing "Warner Bros. Records Inc." as the "author" on the registration form. Copyright Act § 410(c) states:

> In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

17 U.S.C. § 410(c). This language persuasively supports H&L's argument that, on this ground alone, the district court could reasonably conclude that Warner Bros. was the initial author and owner of the Masters, and the protection afforded by § 201(e) is unavailable to Clinton.

But Clinton argues that the Masters were not created as "works for hire," and that Clinton, not Warner Bros., was the original author of the Masters. This argument fails because even if the Masters were not originally "works for hire," § 201(e) protection does not apply where a copyright was previously "transferred voluntarily by that individual author." There is no question that Clinton transferred any interest that he had in the Masters to Warner Bros., and, as part of a settlement arising from unrelated litigation, Warner Bros.

subsequently agreed to transfer ownership back to Clinton. These voluntary transfers provide yet another basis for rejecting Clinton's argument that he enjoys § 201(e) protection as the original author of the master sound recordings.

Relying on the contention that § 201(e) must be read in harmony with the termination provisions of § 304(c) of the Copyright Act, Clinton also argues that his voluntary transfer of the Masters was an unenforceable legal fiction. We understand this argument to be that these provisions enable authors to reclaim transferred copyrights, without limitation, to protect them from unequal bargaining positions caused by the impossibility of determining a work's value until it has been exploited. Clinton implies that the termination provisions in § 304 should be applied to void his original agreement to transfer his copyrights to Warner Bros.

We decline to consider Clinton's § 304 argument, which he raised for the first time in his motion for reconsideration of the district court's order appointing a receiver. "A party does not properly preserve an issue for appeal by raising it for the first time in a motion for reconsideration." *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 912 (9th Cir. 1995). The district court ruled that the motion for reconsideration was untimely, and it never considered the merits of the inalienable termination rights argument. Clinton does not argue that the district court abused its discretion in so ruling, and he identifies no exceptional circumstances that warrant our consideration of his argument for the first time on appeal. *See Gieg v. DDR, Inc.*, 407 F.3d 1038, 1046 n.10 (9th Cir. 2005) ("An appellate court will not consider arguments not

first raised before the district court unless there are exceptional circumstances.").**[6]**

## C. The District Court Did Not Abuse Its Discretion by Appointing a Receiver to Manage or Sell Ownership of These Copyrights.

Federal Rule of Civil Procedure 66 governs the appointment of receivers in federal court. We acknowledged in *Office Depot* that the federal rules qualify as federal statutes for purposes of Rule 69(a). 596 F.3d at 701. While Rule 66 prevails over state law to the extent it applies, it does not provide a different standard for the appointment of a receiver than the one found under Washington law. Therefore, we consider Washington law when reviewing the district court's order appointing a receiver.

---

[6] Clinton did make a related argument that the district court described as follows:

> At oral argument [in the district court, Clinton] took the position that when Warner Bros. conveyed [the Masters] back to [him] in settlement of their dispute, the original "for hire" agreement was "ripped up." According to [Clinton], the destruction of the document effectively erased the original agreement from existence, retroactively changing the reality of the parties' relationship such that the works were not made "for hire" and Clinton became the original "author" of the works. [Clinton] offers no support for this extraordinary theory. There is no contractual provision, case law, or point of logic that would bestow upon Clinton the title of "author" more than a decade after he contractually acknowledged Warner Bros.' statutory claim of authorship.

We agree with the district court that there is no merit to this argument.

The Washington Act Relating to Receiverships conveys broad authority to judges to appoint receivers. A receiver may be appointed if the court "determines that the appointment of a receiver is reasonably necessary and that other available remedies either are not available or are inadequate." Wash. Rev. Code § 7.60.025(1). This statute provides that a receiver may be appointed, in relevant part: "[a]fter judgment, in order to give effect to the judgment," *id.* § 7.60.025(1)(c); "[t]o the extent that property is not exempt from execution, at the instance of a judgment creditor either before or after the issuance of any execution, to preserve or protect it, or prevent its transfer," *id.* § 7.60.025(1)(e); upon attachment of personal property "when the court determines that the nature of the property or the exigency of the case otherwise provides cause for the appointment of a receiver," *id.* § 7.60.025(1)(g); and "as may be provided for by law, or when, in the discretion of the court, it may be necessary to secure ample justice to the parties," *id.* § 7.60.025(1)(nn).

Washington appellate courts have acknowledged that trial courts have broad discretion to appoint receivers, but this discretion "should be exercised with caution in view of all the facts and circumstances of the particular case." *Nw. Defenders Ass'n*, 75 P.3d at 586; *see MONY Life Ins. Co. v. Cissne Family L.L.C.*, 148 P.3d 1065, 1067 (Wash. Ct. App. 2006) ("A trial court abuses its discretion when its decision is manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." (internal quotation marks and citation omitted)). The district court cited § 7.60 generally, and found that "[a] receivership is necessary to ensure justice to the parties and to preserve [the Masters] for the benefit of the parties and to make whole the judgment creditor," H&L. Without citing authority, Clinton argues that the district court's "generic, conclusory" statement that a

receivership is necessary was inadequate, and that the court was required make specific findings to justify appointing a receiver. This argument is not persuasive.

The record shows that the district court heard the parties' arguments and was fully aware of Clinton's claim that the sale of the Masters would be a hardship for him. It recognized that H&L had valid judgments against Clinton, and that H&L had only recovered a portion of Clinton's total debt. The district court was concerned that Clinton would not be able to satisfy this debt in a reasonable amount of time. It also knew that Clinton needed some income to support himself. The court's clear goal was to have a receiver manage these assets so that Clinton could satisfy the judgment and have control of the assets returned to him, if possible. It was well aware that the parties had discussed various proposals allowing them to share the royalties generated by the Masters, but that after years of fighting over the debt in multiple fora, they had failed to come to such an agreement. In short, the district court balanced the equities, and did not abuse its discretion in determining that appointing a receiver was "necessary to secure ample justice to the parties." Wash. Rev. Code § 7.60.025(1)(nn).[7]

---

[7] We express no view as to whether a receiver will remain necessary if other income streams, not contemplated at the time the district court appointed a receiver, become available to satisfy H&L's judgment.

### D. Clinton May Raise Claims of Fraud on the Court and Judicial Estoppel for the First Time on Appeal, But Both Claims are Meritless.

#### 1. Fraud on the Court

Clinton argues for the first time on appeal that H&L perpetrated fraud on the district court.  H&L argues that because this issue was not raised below, it should not be considered on appeal, citing *Weisman v. Charles E. Smith Mgmt., Inc.*, 829 F.2d 511, 514 (4th Cir. 1987) ("We believe that the district court is the proper forum to determine in the first instance whether there is sufficient basis to overturn the judgments on the grounds raised.  That court is in the best position to decide whether any fraud was perpetrated upon it or other untoward action occurred . . . .").

"Courts have inherent equity power to vacate judgments obtained by fraud." *United States v. Estate of Stonehill*, 660 F.3d 415, 443 (9th Cir. 2011) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)); *see also Dixon v. Comm'r*, 316 F.3d 1041, 1046 (9th Cir. 2003) ("Courts possess the inherent power to vacate or amend a judgment obtained by fraud on the court.").  We have held that "[w]hen we conclude that the integrity of the judicial process has been harmed . . . and the fraud rises to the level of 'an unconscionable plan or scheme which is designed to improperly influence the court in its decisions,' we not only can act, we should." *Dixon*, 316 F.3d at 1046 (quoting *England v. Doyle*, 281 F.2d 304, 309 (9th Cir. 1960)).

Though we are free to consider this argument for the first time on appeal, Clinton's claim that H&L perpetrated an "unconscionable scheme" is without merit.  Clinton first

alleges that H&L "fabricated an image" that Clinton refused to pay his debts. He cites H&L's statement to the district court that "Clinton has not voluntarily paid any amounts due," and attempts to rebut it by noting that "in fact, Mr. Clinton voluntarily paid $106,453." But Clinton fails to mention that H&L had to serve separate levies on entities that were believed to owe Clinton royalties in order to satisfy this much of its judgment. These payments were not "voluntary," and Clinton's accusation to the contrary is unsupported.

Clinton also argues that H&L's alleged misrepresentations were "intentional" and "designed to defraud the court by painting an image of hopelessness and utter failure in its attempt to get paid." This argument is belied by the record. H&L repeatedly described its judgment collection efforts in detail to the district court, including successes, failures, and inconclusive outcomes. For instance, H&L filed a status report with the district court in which it spent eighteen pages detailing its various judgment collection efforts and summarizing the amount of money it had recovered as of the date of the report. In his reply brief for this appeal, Clinton admits that H&L's "accounting is correct."

Clinton also argues that H&L falsely represented to the district court that Clinton refused to negotiate. Clinton seems to rely on H&L's assertion that "Clinton refused to engage in such discussions" from 2008 until H&L sought arbitration on the debt, and H&L's representation that Clinton "refus[ed] to participate" in the arbitration proceedings. This argument is unpersuasive because Clinton did not participate in the arbitration proceedings, and it is unclear how an alleged failure to negotiate before arbitration is relevant now.

Finally, Clinton argues that H&L did not convey accurate information to the district court when, at oral argument on H&L's motion to authorize sale of the Masters, H&L's attorney responded to the court's question about whether the Masters were also at issue in related California proceedings. Clinton quotes H&L's attorney as telling the district court that "[t]here is nothing that relates to the same property [in the California proceedings] . . . . While [the Masters] weren't part of the motion [in the California proceedings], I'm not sure they were ever even mentioned except in the very limited context that is referred to in the briefs."   The language Clinton quotes is a selective representation of the exchange between H&L's counsel and the district court.   A more complete reading of the transcript shows that H&L's counsel explained that the royalty streams at issue in California do not pertain to the Masters but to other works.   She also explained that the California action did not involve transfer of copyrights.   We find no merit to the argument that H&L perpetrated a fraud on the court.

## 2.  Judicial Estoppel

Clinton also argues that the district court improperly allowed H&L to take a position inconsistent with arguments it made in the California proceedings regarding its knowledge of Clinton's assets and his willingness to pay the judgments against him.   H&L correctly notes that Clinton raises a different judicial estoppel theory on appeal than he did in the district court, but a "court invokes judicial estoppel at its

discretion" and we consider Clinton's argument on appeal.**[8]**
*Yanez v. United States*, 989 F.2d 323, 326 (9th Cir. 1993).

The Supreme Court observed in *New Hampshire v. Maine*, 532 U.S. 742, 743 (2001), that "[c]ourts have recognized that the circumstances under which judicial estoppel may appropriately be invoked are not reducible to any general formulation," and that "[a]dditional considerations may inform the doctrine's application in specific factual contexts." The Court listed the following factors for consideration:

> First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. Third, courts ask whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose unfair detriment on the opposing party if not estopped.

*Id.*

---

**[8]** In the district court, Clinton argued that H&L previously relied on California law regarding obligations flowing from prior attorney/client relationships and that, in the Washington action, H&L relied on Washington law. On appeal, Clinton's judicial estoppel argument is based on H&L's alleged change of position regarding its knowledge of Clinton's assets and his willingness to satisfy H&L's judgments.

Clinton's argument does not satisfy the first *New Hampshire* factor; he has not shown that H&L took clearly inconsistent positions with respect to its knowledge of Clinton's assets. H&L never asserted, as Clinton suggests, that it has "no idea or way of knowing what Mr. Clinton's assets" are. H&L's statement that it lacks knowledge and information to identify "other assets" and "continues to search for assets and possible avenues of collection" is consistent with its assertion that it "proceeded against known assets but continues to search for 'other' assets."

### E. Clinton Failed to Raise His Preemption, *Erie* Doctrine, and Due Process Arguments in the District Court.

On appeal, Clinton's brief suggests a preemption argument, an argument based on the *Erie* doctrine, and an alleged due process violation. As we have observed, an appellate court generally "will not consider arguments not first raised before the district court unless there are exceptional circumstances." *Gieg*, 407 F.3d at 1046 n.10. Clinton did not argue that there are exceptional circumstances for considering these issues, but in any case we find them to be without merit.

Clinton claimed at oral argument before our court that he raised a preemption argument in opposition to H&L's motion for sale of the copyrights. The brief to which Clinton refers only makes a general reference to the U.S. Constitution's Supremacy Clause. Clinton conceded at oral argument that he did not raise his *Erie* argument in the district court. On appeal, this part of his brief urges our court to certify to the Washington state supreme court the question whether a copyright is subject to execution to satisfy a judgment, but he

cites no authority for the implied contention that we are obligated to certify this question. *In re Complaint of McLinn*, 744 F.2d 677, 681 (9th Cir. 1984) ("Use of certification rests in the sound discretion of this court."). Clinton did not raise his due process argument before the district court. In any case, this portion of his appellate brief merely repeats his contention that the district court abused its discretion by appointing a receiver. We have already rejected this argument.

## CONCLUSION

The district court's order appointing a receiver and authorizing the sale of copyrights is **AFFIRMED**.