**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STATE OF ARIZONA; SALT RIVER
PIMA-MARICOPA INDIAN
COMMUNITY,
                    *Plaintiffs*,

and

GILA RIVER INDIAN COMMUNITY,
                    *Plaintiff-Appellant*,

v.

TOHONO O'ODHAM NATION,
                    *Defendant-Appellee*.

No. 13-16517

D.C. No.
2:11-cv-00296-
DGC

STATE OF ARIZONA,
                    *Plaintiff-Appellant*,

and

GILA RIVER INDIAN COMMUNITY;
SALT RIVER PIMA-MARICOPA
INDIAN COMMUNITY,
                    *Plaintiffs*,

v.

TOHONO O'ODHAM NATION,
                    *Defendant-Appellee*.

No. 13-16519

D.C. No.
2:11-cv-00296-
DGC

STATE OF ARIZONA; GILA RIVER
INDIAN COMMUNITY,
                    *Plaintiffs*,

and

SALT RIVER PIMA-MARICOPA
INDIAN COMMUNITY,
                    *Plaintiff-Appellant*,

v.

TOHONO O'ODHAM NATION,
                    *Defendant-Appellee*.

No. 13-16520

D.C. No.
2:11-cv-00296-
DGC

OPINION

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted
December 7, 2015—San Francisco, California

Filed March 29, 2016

Before: Diarmuid F. O'Scannlain, Barry G. Silverman,
and Carlos T. Bea, Circuit Judges.

Opinion by Judge Bea

## SUMMARY[*]

### Indian Gaming Regulatory Act

Affirming the district court's judgment, the panel held that the Tohono O'odham Nation's plan to build a casino and conduct Class III gaming on a certain parcel of land did not violate a gaming compact between the Nation and the State of Arizona.

The Compact expressly authorizes Class III gaming (table card games and slot machines) on the "Indian Lands" of the Nation. The Compact defines "Indian Lands" as lands defined in 25 U.S.C. § 2703(4)(A) and (B) and subject to the provisions of 25 U.S.C. § 2719. Section 2719 provides that

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

although Class III gaming is generally barred on land taken into trust after the effective date of the Indian Gaming and Regulatory Act ("IGRA"), that bar does not apply to land taken into trust as part of a settlement of a land claim.

After the Compact was approved, the Nation purchased land in Glendale, Arizona, with settlement funds it had acquired under the Gila Bend Indian Reservation Lands Replacement Act ("LRA") after reservation lands were destroyed in flooding. The United States took a portion of the Glendale-area land, known as "Parcel 2," into trust for the Nation pursuant to the LRA.

Affirming the district court's summary judgment, the panel held that the land acquired and taken into trust pursuant to the LRA was land taken into trust as part of a settlement of a land claim under IGRA § 2719, and thus IGRA did not bar the Nation from gaming on Parcel 2. The panel also affirmed the district court's summary judgment in favor of the Nation on breach of Compact claims, because the Compact specifically authorizes Class III gaming on Indian lands that qualify for gaming under IGRA § 2719. In addition, the panel affirmed the district court's ruling that tribal sovereign immunity barred non-Compact-based claims for promissory estoppel, fraud in the inducement, and material misrepresentation.

## COUNSEL

Pratik A. Shah (argued), Merrill C. Godfrey, Z.W. Julius Chen, and John B. Capehart, Akin Gump Strauss Hauer & Feld LLP, Washington, D.C., for Plaintiff-Appellant Gila River Indian Community.

Mary R. O'Grady, Shane M. Ham, and Grace E. Rebling, Osborn Maledon, P.A., Phoenix, Arizona, for Plaintiff-Appellant Salt River Pima-Maricopa Indian Community.

Robert L. Ellman (argued), Solicitor General, Thomas C. Horne, Attorney General, and Michael Tryon, Assistant Attorney General, Arizona Attorney General's Office, Phoenix, Arizona, for Plaintiff-Appellant State of Arizona.

Seth P. Waxman (argued), Danielle Spinelli, Kelly P. Dunbar, Sonya L. Lebsack, and Adam Klein, Wilmer Cutler Pickering Hale & Dorr LLP, Washington, D.C.; Jonathan Jantzen, Attorney General, Laura Berglan, Deputy Attorney General, Tohono O'odham Nation Attorney General's Office, Sells, Arizona, for Defendant-Appellee Tohono O'odham Nation.

**OPINION**

BEA, Circuit Judge:

This appeal requires us to consider whether sophisticated, represented parties really meant what they wrote in a gaming compact that was duly executed after years of tedious negotiations. Like the district court, we hold the parties to their words, and affirm the district court's orders in favor of the Tohono O'odham Nation.

**I.**

In 2002, the Tohono O'odham Nation ("the Nation") and the State of Arizona executed a gaming compact ("the Compact") pursuant to the federal Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701–2721. The Compact

expressly authorizes Class III gaming[1] on the "Indian Lands" of the Nation. The Compact defines "Indian Lands" as "lands defined in 25 U.S.C. § 2703(4)(A) and (B),[2] subject to the provisions of 25 U.S.C. § 2719." In turn, § 2719 of IGRA provides that although Class III gaming is generally barred on land taken into trust after IGRA's effective date (October 17, 1988), that bar does not apply to land "taken into trust as part of . . . a settlement of a land claim." 25 U.S.C. § 2719(b)(1)(B). Additionally, the Compact contains an integration clause, which provides that the Compact "contains the entire agreement of the parties with respect to matters covered by this Compact and no other statement, agreement, or promise made by any party, officer, or agent of any party shall be valid or binding."

After the Compact was approved by the Secretary of the Interior and became effective in 2003, the Nation purchased an unincorporated parcel of land within the outer boundaries of Glendale, Arizona, pursuant to federal Gila Bend Indian Reservation Lands Replacement Act ("LRA"). Congress enacted the LRA in 1986 after continuous heavy flooding caused by a federally-constructed dam rendered over 9,000 acres of the Nation's reservation lands, which it had used principally for agriculture, economically useless. The LRA gave the Nation $30 million in "settlement funds" to purchase replacement reservation lands, provided the Nation "assign[ed] to the United States all right, title, and interest of

---

[1] Class III gaming includes table card games, such as blackjack, and slot machines. *See* 25 U.S.C. § 2703(7)–(8).

[2] Section 2703(4) defines "Indian lands" as "all lands within the limits of any Indian reservation; and any lands title to which is . . . held in trust by the United States for the benefit of any Indian tribe." 25 U.S.C. § 2703(4).

the Tribe in nine thousand eight hundred and eighty acres of land within the Gila Bend Indian Reservation" and "execute[d] a waiver and release" "of any and all claims of water rights or injuries to land or water rights . . . with respect to the lands of the Gila Bend Indian Reservation from time immemorial to the date of the execution by the Tribe of such a waiver."  In 1987, the Nation entered into a written agreement with the United States pursuant to the LRA in which the Nation waived and released its claims against the United States and assigned the United States "all right, title and interest" in 9,880 acres of its destroyed reservation lands in exchange for $30 million.

On July 7, 2014, the United States took a portion of the Glendale-area land, known as "Parcel 2," into trust for the Nation pursuant to the LRA.  We recently affirmed the legality of the Secretary's taking of Parcel 2 into trust for the benefit of the Nation under the LRA.  *See Nation v. City of Glendale*, 804 F.3d 1292, 1301 (9th Cir. 2015).  The Nation desires to build a casino and conduct Class III gaming on Parcel 2.

The State of Arizona, the Gila River Indian Community, and the Salt River Pima-Maricopa Indian community (the "Plaintiffs") brought an action in federal district court in Arizona against the Nation, seeking to enjoin the Nation's plan to conduct Class III gaming on Parcel 2.  To bring their action, the Plaintiffs invoked § 2710(d)(7)(A)(ii) of IGRA, which grants the United States district courts jurisdiction over "any cause of action initiated by a State or Indian tribe to enjoin a [C]lass III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact." 25 U.S.C. § 2710(d)(7)(A)(ii). Plaintiffs alleged that Class III gaming on Parcel 2, since it was acquired after IGRA's

effective date (October 17, 1988), would violate the Compact because the LRA was not a "settlement of a land claim" under IGRA § 2719, and because the Compact *implicitly* bars the Nation from gaming in the Phoenix area. Plaintiffs also alleged other non-Compact-based claims, including promissory estoppel, fraud in the inducement, and material misrepresentation.

After a year of discovery, the parties filed cross-motions for summary judgment. The district court granted summary judgment in favor of the Nation because it concluded that land acquired and taken into trust pursuant to the LRA was land "taken into trust as part of . . . a settlement of a land claim" under IGRA § 2719(b)(1)(B)(1), and thus IGRA did not bar the Nation from gaming on Parcel 2. The court also granted summary judgment in favor of the Nation on Plaintiffs' breach of Compact claims, because the Compact specifically authorizes Class III gaming on Indian lands that qualify for gaming under IGRA § 2719. The court also ruled that the doctrine of tribal sovereign immunity barred the Plaintiffs' non-Compact-based claims for promissory estoppel, fraud in the inducement, and material misrepresentation, and thus dismissed these claims for lack of subject matter jurisdiction. Plaintiffs appeal the district court's rulings in favor of the Nation.

## II

A district court's grant or denial of summary judgment is reviewed *de novo*. *Arce v. Douglas*, 793 F.3d 968, 975–76 (9th Cir. 2015). "The district court may grant summary judgment on 'each claim or defense—or the part of each claim or defense—on which summary judgment is sought.' Fed. R. Civ. P. 56(a). Summary judgment is proper where the

pleadings, the discovery and disclosure materials on file, and any affidavits show that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)." *Nation v. City of Glendale*, 804 F.3d 1292, 1297 (9th Cir. 2015).

This court reviews "de novo a district court's dismissal for lack of subject matter jurisdiction." *Miller v. Wright*, 705 F.3d 919, 923 (9th Cir. 2013). "Whether Congress has abrogated the sovereign immunity of Indian tribes by statute is a question of statutory interpretation and is reviewed *de novo*." *Krystal Energy Co. v. Navajo Nation*, 357 F.3d 1055, 1056 (9th Cir. 2004), *as amended on denial of reh'g en banc* (Apr. 6, 2004).

A district court's construction or interpretation of IGRA is question of law, and is reviewed *de novo* on appeal. *See United States v. 103 Elec. Gambling Devices*, 223 F.3d 1091, 1095 (9th Cir. 2000).

## III

### A. *Interpretation of IGRA § 2719*

Plaintiffs argue that the district court erroneously concluded that land acquired and taken into trust pursuant to the LRA qualifies as land "taken into trust as part of . . . a settlement of a land claim" under § 2719(b)(1)(B)(i) of IGRA. If land acquired and taken into trust pursuant to the LRA qualifies as land "taken into trust as part of . . . a settlement of a land claim," then it is exempt from IGRA's prohibition of Class III gaming on Indian lands acquired and

taken into trust after October 17, 1988.    25 U.S.C. § 2719(b)(1)(B)(i).

To determine if land taken into trust pursuant to the LRA qualifies as land "taken into trust as part of . . . a settlement of a land claim" under § 2719(b)(1)(B)(i) of IGRA, we must first discern the meaning of the term "land claim." Plaintiffs argue that a "land claim" "applies to claims to title or possession of land, not to injuries to land," and base their argument on a Department of the Interior ("DOI") regulation that defines a "land claim" as follows:

> Land claim means any claim by a tribe concerning the impairment of title or other real property interest or loss of possession that:
>
> (1) Arises under the United States Constitution, Federal common law, Federal statute or treaty;
>
> (2) Is in conflict with the right, or title or other real property interest claimed by an individual or entity (private, public, or governmental); and
>
> (3) Either accrued on or before October 17, 1988, or involves lands held in trust or restricted fee for the tribe prior to October 17, 1988.

25 C.F.R. § 292.2.

"We review an agency's interpretation of a statute it is charged with administering under the familiar two-step framework set forth in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)." *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 902 (9th Cir. 2012). We must first determine whether "Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43. "[I]f the statute is silent or ambiguous with respect to the specific issue," however, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. "If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Salazar*, 695 F.3d at 902 (quoting *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005)).

Thus, we must first determine whether "land claim," as it is used in § 2719(b)(1)(B)(i), is ambiguous. "A statute is ambiguous if it is susceptible to more than one reasonable interpretation." *Alaska Wilderness League v. EPA*, 727 F.3d 934, 938 (9th Cir. 2013). The starting point is the statutory text. *Chevron*, 467 U.S. at 842–43. "Land claim" is not defined in IGRA, and is not used elsewhere in the statute. *See* 25 U.S.C. § 2703 (definitions section). The statutory context and surrounding language do not produce much

clarity either.[3]  "When a statute does not define a term, we generally interpret that term by employing the ordinary, contemporary, and common meaning of the words that Congress used."  *United States v. Gallegos*, 613 F.3d 1211, 1214 (9th Cir. 2010) (quoting *United States v. Iverson*, 162 F.3d 1015, 1022 (9th Cir. 1998)).  Here, the language used has a broad, general meaning.  *See Black's Law Dictionary* (10th ed. 2014) (defining "claim" as "[t]he assertion of an existing right; any right to payment or to an equitable remedy, even if contingent or provisional . . . [a] demand for money, property, or a legal remedy to which one asserts a right").  Thus, a "land claim" can be a claim for impairment to title of land, or as a claim for damage to land. But a word or phrase is not ambiguous just because it has a broad general meaning under the *generalia verba sunt generaliter intelligenda*[4] canon of statutory construction.  *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) ("As we have said before, the fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity.  It demonstrates breadth." (internal quotation marks omitted)).  We do not find "land claim" to be ambiguous as used in § 2719(b)(1)(B)(i).  As noted above, "claim" is a broad and general word, and therefore a claim for impairment to title of land, a claim for dispossession of land, and a claim for damage to land would all be encompassed by it.  *See* Scalia & Garner, *Reading Law: The Interpretation of*

---

[3] The language of the full exception reads: "Subsection (a) of this section will not apply when lands are taken into trust as part of: (i) a settlement of a land claim, (ii) the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process, or (iii) the restoration of lands for an Indian tribe that is restored to Federal recognition."  25 U.S.C. § 2719(b)(1)(B).

[4] "General words are to be understood in a general sense."

*Legal Texts* 101 (2012) ("Without some indication to the contrary, general words . . . are to be accorded their full and fair scope.").  Here, under the ordinary meaning of the words used in the statutory text, the Nation plainly had "land claims" for damage to its reservation lands.

In any case, were we to find the term "land claim" to be ambiguous, and proceed under *Chevron* to apply the DOI's definition of the term, then we would find that the Nation also had a claim concerning the *impairment of title or other real property interest* or *loss of possession of its reservation land*.[5] The flooding of the Nation's reservation due to the federal government's construction of the Painted Rock dam gave rise for a trespass claim severe enough to constitute an unlawful taking without just compensation.  *Arkansas Game & Fish Comm'n v. United States*, 133 S. Ct. 511, 519 (2012) ("[G]overnment-induced flooding can constitute a taking of property.").  The Nation had a claim that the continual flooding of its lands due to the Painted Rock Dam exceeded the scope of the government's flowage easement, which allowed the government "occasionally" to "overflow, flood, and submerge" the Nation's lands, because the flooding rendered "all of the arable land of the reservation—5,962 acres—to be unsuitable for agriculture."  The remaining 4,000 acres of the Nation's reservation were of "little or no economic value" due to "repeated flooding, silt deposition and salt cedar infestation."  This taking by definition constituted a claim for the interference to the Nation's title to and possession of its land, and the flooding interfered with "other real property interest[s]," such as the Nation's use of the land.

---

[5] *See* 25 C.F.R. § 292.2.

Furthermore, the district court did not err in determining that the LRA was a "settlement" of the Nation's land claims. Congress enacted the LRA to "facilitate replacement of reservation lands with lands suitable for sustained economic use which is not principally farming . . . ."  The LRA required the Nation to assign to the federal government "all right, title and interest of the Tribe" in 9,880 acres of land the government flooded in the Gila Bend Indian Reservation, and to execute a "waiver and release" of "any and all claims of water rights or injuries to land or water rights . . . with respect to the lands of the Gila Bend Indian Reservation from time immemorial to the date of the execution by the Tribe of such a waiver" in exchange for $30 million in "settlement funds" that the Nation could use to purchase new tribal lands.

Additionally, the LRA expressly provides that "[a]ny land which the Secretary holds in trust [under the Act] shall be deemed to be a Federal Indian Reservation for *all* purposes." In sum, we hold that Parcel 2, which the United States is now holding in trust for the benefit of the Nation, meets the requirements of § 2719(b)(1)(B)(i) of IGRA.

## B.  *Judicial Estoppel and Waiver*

Plaintiffs argue that the Nation is judicially estopped from asserting that it has a right to conduct Class III gaming on Parcel 2 under IGRA because of a position the Nation took in a supplemental brief submitted to an arbitrator during an unsuccessful arbitration proceeding relating to negotiations of a 1993 Gaming Compact between the Nation and Arizona. Plaintiffs also claim that the Nation waived its right to conduct Class III gaming on Parcel 2 under IGRA because the Nation was present when a "handout" was distributed at a 1993 meeting between Arizona legislative staff and tribal

representatives; the handout stated the "settlement of a land claim" exception to IGRA's prohibition of gaming on tribal lands taken into trust after October 17, 1988 would not affect Arizona. We address each argument below, and conclude that the district court correctly rejected both of these arguments.

"[J]udicial estoppel 'is an equitable doctrine invoked by a court at its discretion'" "to protect the integrity of the judicial process." *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001) (internal quotation marks omitted). Thus, we review the district court's decision whether to invoke judicial estoppel for an abuse of discretion. See *Hendricks & Lewis PLLC v. Clinton*, 766 F.3d 991, 995 (9th Cir. 2014). We conclude that the district court did not abuse its discretion in holding that the doctrine of judicial estoppel does not bar the Nation from asserting that it has a right to conduct Class III gaming on Parcel 2. Here's why.

Federal courts consider the following factors described by the Supreme Court in *New Hampshire* when deciding whether to invoke the doctrine of judicial estoppel:

> First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. Third, courts ask whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose

unfair detriment on the opposing party if not
estopped.

*Id.* at 1001 (quoting *New Hampshire*, 532 U.S. at 750–51).

Prior to executing the 1993 Gaming Compact, the Nation
and Arizona were parties to a nonbinding arbitration
proceeding under IGRA, where the Nation and Arizona each
submitted a "last best offer" compact to an arbitrator, who
was to choose one of the two proposals without amendment.
In response to a provision in Arizona's proposed compact
which would have barred Class III gaming on lands acquired
in trust after IGRA's effective date, the Nation submitted a
supplemental brief which explained that Arizona's provision:

> would result in the Nation forfeiting the rights
> provided to tribes in IGRA to request that in
> certain circumstances after-acquired trust land
> be available for class III gaming activities.
> The existing federal law requires the
> Governor's concurrence. This is adequate
> protection to the State and local interests. The
> State simply seeks an ancillary benefit in this
> provision.

Here, the district court correctly recognized and applied
the three *New Hampshire* factors, and thus did not abuse its
discretion in deciding not to apply the doctrine of judicial
estoppel. In regard to the first *New Hampshire* factor, these
sentences in the Nation's 1992 brief are not "clearly
inconsistent" with Nation's argument in this case that land it
acquired in trust under the LRA qualifies as a "settlement of
a land claim" pursuant to § 2719(b)(1)(B)(i) of IGRA. The
passage quoted above simply does not state that the Nation

would not ever pursue gaming under § 2719(b)(1)(B)(i) of IGRA in the future.  The passage states that acceptance of Arizona's provision would result in "after-acquired trust land" not being available for Class III gaming in undefined "certain circumstances."  Thus, purchase of land after 1988 would be one "certain circumstance."  But acquisition of land as "part of . . . a settlement of a land claim" was not mentioned as forfeited from use for Class III gaming.  The second *New Hampshire* factor, whether the Nation succeeded in persuading the arbitrator to accept its argument, also weighs in favor of the Nation.  Although the arbitrator ultimately selected the Nation's compact, the arbitrator expressed no view on whether and how the § 2719 IGRA after-acquired land exceptions would apply.  In any case, Arizona refused to consent to the arbitrator's selection, and the arbitration concluded without the Nation obtaining any relief, as the parties then returned to negotiations.  The third *New Hampshire* factor, whether the Nation's statements in the arbitration created an "unfair advantage or impose[d] an unfair detriment on [the Plaintiffs]," favors the Nation as well.  Since the arbitration failed to produce a binding compact, the Secretary of the Interior sent the Nation and Arizona back to negotiations, where Arizona was free to pursue any compact terms it desired.

Additionally, the Nation did not waive its right to conduct Class III gaming on its Glendale-area property under IGRA simply because the Nation was present when a handout was distributed at a 1993 meeting between Arizona legislative staff and representatives of various Arizona Indian tribes.

"A waiver is an intentional relinquishment or abandonment of a known right or privilege.  It can preclude the assertion of legal rights.  An implied waiver of rights will

be found where there is 'clear, decisive and unequivocal' conduct which indicates a purpose to waive the legal rights involved." *United States v. Amwest Sur. Ins. Co.*, 54 F.3d 601, 602–03 (9th Cir. 1995) (internal citations and quotation marks omitted).

Here, during negotiations for the 1993 Compact, tribal representatives of various Arizona Indian tribes, including the Nation, met with Arizona legislative staffers. At the meeting, a handout was distributed which read:

> Another exception to the prohibition of gaming on after acquired lands is when the lands are taken into trust as part of a settlement of land claim. This will not effect [sic] Arizona because aboriginal land claims in Arizona have already been settled pursuant to the Indian Claims Commission Act of 1946.

There is nothing in the record that shows that representatives of the Nation either drafted or distributed the handout or were primary speakers at this meeting. Plaintiffs instead support their waiver claim by arguing that the Nation was present at the meeting and did not voice disagreement with the handout. Because mere silence is not "clear, decisive and unequivocal conduct," *Amwest Sur. Ins. Co.*, 54 F.3d at 603 (quoting *Groves v. Prickett*, 420 F.2d 1119, 1125 (9th Cir. 1970)), we agree with the district court that we "cannot conclude that the Nation's silence during the 1993 meeting constituted a knowing waiver, in perpetuity, of its right to claim the exception in § 2719(b)(1)(B)(i)."

But even were we to assume there was a duty to object to the legislative staffers' view that no Arizona land could be affected by the "settlement of a land claim" exception, and that view was voiced during the negotiations for the 1993 compact, that view did not make it into the Compact as written and executed.  Hence, it is without contractual force because of the integration clause of the Compact, which provides that the Compact "contains the entire agreement of the parties with respect to matters covered by this Compact and no other statement, agreement, or promise made by any party, officer, or agent of any party shall be valid or binding."

## IV

The Plaintiffs argue that the language of the Compact implicitly prohibits Class III gaming on the Glendale-area property purchased by the Nation and held in trust by the government, and Plaintiffs seek to introduce extrinsic evidence to prove this claim.  The Nation responds that the district court correctly granted it summary judgment on this issue, because "IGRA authorizes gaming on the Settlement Property, and the Compact's plain terms authorize the Nation to game where IGRA permits."

The Compact contains a choice-of-law clause, but it does not clearly identify what law applies to interpret the terms of the Compact.  The clause provides: "This Compact shall be governed by and construed in accordance with the applicable laws of the United States, and the Nation and the State."  To decide whether Plaintiffs' proffered extrinsic evidence was admissible, the district court first engaged in a choice-of-law analysis, pursuant to the Restatement (Second) of Conflicts of Law, to determine what body of law governed the interpretation of the Compact: federal common law or

Arizona state law.[6]  As discussed below, although the district court erred in concluding that Arizona state law governs the interpretation of the Compact, this error is harmless because the same outcome results under both federal common law and Arizona contract law.  This is because the Plaintiffs rely on extrinsic evidence to vary or contradict the written terms of the Compact, which is not permissible under either federal common law or Arizona contract law.

We recently reaffirmed that "[g]eneral principles of federal contract law govern . . . Compacts[] which were entered pursuant to IGRA." *Pauma Band of Luiseno Mission Indians v. California*, — F.3d —, No. 14-56104, 2015 WL 9245245, at *4 (9th Cir. Dec. 18, 2015) (quoting *Cachil Dehe Band of Wintun Indians of the Colusa Indian Community v. California*, 618 F.3d 1073 (9th Cir. 2010)).  Federal common law follows the traditional approach for the parol evidence rule: "[A] contract[] must be discerned within its four corners, extrinsic evidence being relevant only to resolve ambiguity in the [contract]." *United States v. Asarco Inc.*, 430 F.3d 972, 980 (9th Cir. 2005).

Arizona's parol evidence rule is more liberal: "[T]he judge first considers the offered evidence, and if he or she finds that the contract language is 'reasonably susceptible' to the interpretation asserted by the proponent, the evidence is admissible to determine the meaning intended by the parties." *Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134, 1140 (Ariz. 1993).  In applying Arizona's parol evidence rule, however, the Ninth Circuit has noted that "the *Taylor* court

---

[6] The district court noted that "[a]lthough the governing law provision of the Compact also mentions the Nation's law, the Nation has no developed law on the parol evidence rule."

specifically limited its liberal use of parol evidence to contract interpretation and *rejected its use to vary or contradict a final agreement.*" *Velarde v. PACE Membership Warehouse, Inc.*, 105 F.3d 1313, 1317–18 (9th Cir. 1997) (emphasis added) (citing *Taylor*, 854 P.2d at 1139 –40).

Here, to begin, the Compact that the parties executed contains an integration clause which provides that the "Compact contains the entire agreement of the parties with respect to the matters covered by this Compact and no other statement, agreement, or promise made by any party, officer, or agent of any party shall be valid or binding." While not dispositive, this broad integration clause that was agreed to by sophisticated, represented parties after years of tedious negotiations strongly counsels in favor of rejecting Plaintiffs' proffered extrinsic evidence to interpret the terms of the duly-executed written agreement. Section 3(a) of the Compact, entitled "Authorized Class III Gaming Activities," explicitly authorizes the Nation to conduct Class III gaming, subject to the terms and conditions of the Compact. Plaintiffs seek to introduce extrinsic evidence to prove that during negotiations of the Compact, the parties understood that the Compact would bar the Nation from opening a casino in the Phoenix metropolitan area. But § 3(j) of the Compact, entitled "Location of Gaming Facility," contains no such limitation, and provides that "[a]ll Gaming Facilities shall be located on the Indian Lands of the Tribe," and "Gaming Activity on lands acquired after the enactment of the [IGRA] on October 17, 1988 *shall be authorized* only in accordance with 25 U.S.C. § 2719." The only other language in the Compact which could be read to limit the location of the Nation's gaming facilities is § 3(c)(3), which provides:

> If the Tribe is the Tohono O'odham Nation, and if the Tribe operates four (4) Gaming Facilities, then at least one of the four (4) Gaming Facilities shall: a) be at least 50 miles from the existing Gaming Facilities of the Tribe in the Tucson metropolitan area as of the Effective Date.

This language clearly does not prohibit the Nation from gaming in the Phoenix metropolitan area on its Indian Lands.[7]

In short, the duly-executed Compact negotiated at length by sophisticated parties expressly authorizes the Nation to conduct gaming on its "Indian Lands," subject to the requirements of IGRA § 2719. This language is unambiguous and not reasonably susceptible to Plaintiffs' interpretation that the Compact implicitly bars the Nation from gaming in the Phoenix metropolitan area. The Plaintiffs' extrinsic evidence to the contrary attempts to vary or contradict the terms of a final agreement, and therefore must be rejected. Since we hold that Parcel 2 complies with the requirements of IGRA § 2719, and the Compact expressly allows the Nation to conduct Class III gaming there, the district court correctly entered summary judgment in favor of the Nation on Plaintiffs' breach of Compact claim.

---

[7] Application of the interpretive tool *expressio unius est exclusio alterius* ("the expression of one thing is the exclusion of the other") also supports this reading of the Compact. The language described above is the only express limitation in the executed Compact on the geographic location of the Nation's gaming facilities.

## V

Relatedly, Plaintiffs also argue that the Nation's plan to conduct Class III gaming on Parcel 2 violates the implied covenant of good faith and fair dealing in the Compact.

"It is true that there is an implied covenant in every contract that each party will do nothing to deprive the other of the benefits arising from the contract." *Sessions, Inc. v. Morton*, 491 F.2d 854, 857 (9th Cir. 1974). "This 'covenant of fair dealing' imposes the duty on each party to do everything that the contract presupposes will be done in order to accomplish the purpose of the contract. However, this implied obligation must arise from the language used or it must be indispensable to effectuate the intention of the parties." *Id.* (internal quotation marks omitted).

Here, the terms of the Compact do not prohibit the Nation from building a Class III casino in the Phoenix area; to the contrary, the Compact expressly authorizes Class III gaming on "Indian lands," subject to the requirements of 25 U.S.C. § 2719(b)(1)(B)(i). Thus, since Parcel 2 in Glendale is now held in trust as part of the Nation's "Indian Lands," see *Nation*, 804 F.3d at 1301, and Parcel 2 meets the requirements of IGRA, the Compact authorizes the Nation to conduct gaming there. Based on the terms of the Compact, it is not reasonable for Plaintiffs to expect that the Compact prohibits the Nation from the conduct of gaming on Parcel 2. The Nation's choice to conduct Class III gaming in accordance with the express terms of the Compact does not deviate from the agreed common purpose of the Compact, and therefore does not breach the implied covenant of good faith and fair dealing.

## VI

Plaintiffs' last argument is that the district court erred in ruling that tribal sovereign immunity bars Plaintiffs' claims against the Nation for promissory estoppel, fraudulent inducement, and material misrepresentation. This argument is without merit.

"As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998). Here, the Compact expressly states that it does not waive the Nation's tribal sovereign immunity. Plaintiffs claim instead that § 2710(d)(7)(A)(ii) of IGRA abrogates the Nation's tribal sovereign immunity for their non-Compact claims. Not so. That section provides that "[t]he United States district courts shall have jurisdiction over . . . any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands *and conducted in violation of any Tribal-State compact* . . . ." 25 U.S.C. § 2710(d)(7)(A)(ii) (emphasis added). Congress thus abrogated the Nation's tribal sovereign immunity for claims alleging only violations of the Compact. *See Rincon Band of Luiseno Mission Indians v. Schwarzenegger*, 602 F.3d 1019, 1028 n.9 (9th Cir. 2010) (recognizing "the canon of construction obligating [the court] to construe a statute abrogating tribal rights narrowly and most favorably towards tribal interests").

The district court correctly found that Plaintiffs' claims for fraud in the inducement, material misrepresentation, and promissory estoppel do not constitute claims for a violation of the Compact. "A promissory estoppel claim is not the same as a contract claim. Promissory estoppel . . . is not a

theory of contract liability." *Double AA Builders v. Grand State Constr.*, 114 P.3d 835, 843 (Ariz. Ct. App. 2005). And fraudulent inducement and material misrepresentation are tort claims, not breach of contract claims. *See Morris v. Achen Constr. Co.*, 747 P.2d 1211, 1213 (Ariz. 1987) ("The duty not to commit fraud is obviously not created by a contractual relationship and exists . . . even when there is no contractual relationship between the parties at all."). As such, these claims do not fall within IGRA's limited abrogation of tribal sovereign immunity.[8]  25 U.S.C. § 2710(d)(7)(A)(ii). Therefore, the district court correctly concluded that it lacked subject matter jurisdiction over Plaintiffs' non-Compact claims.

---

[8] Plaintiffs cite a footnote in the U.S. Supreme Court's recent *Bay Mills* decision for the proposition that the doctrine of tribal sovereign immunity should not bar tort claims against an Indian Tribe at all. But in the cited footnote, the Court was discussing the principle of *stare decisis*, and expressly reserved decision on whether a case involving an unwitting "tort victim" "would present a 'special justification' for abandoning precedent," because that case was "not before [the Court]." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2036 n.8 (2014) (quoting *Arizona v. Rumsey*, 467 U.S. 203, 212 (1984)). We have held that tribal sovereign immunity bars tort claims against an Indian tribe, and that remains good law. *See Cook v. AVI Casino Enters., Inc.*, 548 F.3d 718, 725 (9th Cir. 2008) (affirming dismissal of plaintiff's negligence claims against the Fort Mojave Indian Tribe under doctrine of tribal sovereign immunity, where the plaintiff was seriously injured by an intoxicated driver who had been drinking at a casino operated by the Tribe).

Furthermore, as the Supreme Court also noted in *Bay Mills*, "it is fundamentally Congress's job, not [the federal courts], to determine whether or how to limit tribal immunity. The special brand of sovereignty the tribes retain—both its nature and its extent—rests in the hands of Congress." *Bay Mills Indian Cmty.*, 134 S. Ct. at 2037.

**CONCLUSION**

For the foregoing reasons, the orders of the district court in favor of the Nation are **AFFIRMED.**